958 F.2d 537
 36 Soc.Sec.Rep.Ser. 545, Medicare & Medicaid Guide
P 40,058
SACRED HEART MEDICAL CENTER,
v.
Louis W. SULLIVAN, M.D., in his official capacity as
Secretary of Health and Human Services.
Louis W. Sullivan, M.D., Secretary of Health & Human
Services, Appellant.
 No. 91-1795.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 14, 1992.
Decided March 9, 1992.
 
 Stuart M. Gerson, Asst. Atty. Gen., Michael M. Baylson, U.S. Atty., Anthony J. Steinmeyer, Scott R. McIntosh (argued), Attys., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for appellants.
 Dennis M. Barry (argued), David J. Tuckfield, Vinson & Elkins, Washington, D.C., Lewis J. Hoch, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for appellee.
 Before GREENBERG, COWEN, and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 I. BACKGROUND
 
 1
 The defendant, Louis W. Sullivan, Secretary of Health and Human Services, appeals from an order of the district court entered on July 12, 1991, compelling him "to make an appropriate retroactive adjustment to the calculation of [appellee Sacred Heart Medical Center's] hospital-specific costs and the Medicare reimbursements based thereon" in this Medicare reimbursement case. This case originated when Sacred Heart commenced an administrative proceeding against the Secretary of Health and Human Services ("HHS") before the Provider Reimbursement Review Board (the "Board") under 42 U.S.C. § 1395oo(a) to recover reimbursement from HHS under the Prospective Payment System ("PPS") for certain inpatient operating costs the Hospital had incurred. The Board determined that Sacred Heart was not entitled to reimbursement, a decision the Administrator of the Health Care Financing Administration ("HCFA") declined to review.
 
 
 2
 Sacred Heart then sought judicial review of the Board's decision in the United States District Court for the Eastern District of Pennsylvania, which exercised jurisdiction pursuant to 42 U.S.C. § 1395oo(f). The parties filed cross-motions for summary judgment, and on July 11, 1991, the district court issued a memorandum opinion determining that Sacred Heart was entitled to the reimbursement it requested. The Secretary filed a timely notice of appeal and we have jurisdiction to review the district court's final order under 28 U.S.C. § 1291.
 
 II. FACTS AND PROCEDURAL HISTORY
 
 3
 The facts of this case are not in dispute. Sacred Heart is a 236-bed, non-profit hospital located in Chester, Pennsylvania, said to be an "economically distressed area with the highest percentage of people in public housing in the [United States.]" Sacred Heart opened its facilities to the public in 1959, but undertook no new construction until the 1980's. As a result, the Pennsylvania Department of Health cited the Hospital for code violations and licensure deficiencies and, in addition, the Health Systems Agency of Southeastern Pennsylvania ("HSA"), the local health planning agency, and the Joint Commission on Accreditation of Hospitals, noted numerous "deficiencies" related to the Hospital's physical plant.[1]
 
 
 4
 To remedy this problem, the Hospital submitted a letter of intent to the HSA proposing an expansion of its facilities. The HSA accepted this proposal, and recommended to the Pennsylvania Department of Health that Sacred Heart be expanded. That department, in turn, approved the expansion and recommended to HHS that Sacred Heart's construction-related expenditures be reimbursed. HHS accepted this recommendation, and approved the project. Although the construction was scheduled to be completed in August 1982, it was not actually completed until June 1983 due to construction problems, delays in financing, problems with a concrete sub-contractor, delays in the delivery of cabinetry, and a carpenter's strike.
 
 
 5
 In the expansion a free-standing building was constructed and connected to the existing facility. This new building houses the Hospital's intensive care unit, one floor of patient rooms, an area for maintenance equipment, the lobby, the admissions area, the emergency room, the laboratory, the radiology department, the physical therapy department and a nuclear medicine unit. Sacred Heart hired 19 nurses to cover the new facilities. This expansion is the focus of the appeal, for Sacred Heart claims that it is entitled to be compensated for its increased operating costs resulting from the expansion, while the Secretary claims that the relevant federal statute and implementing regulations do not require the government to reimburse the Hospital for these costs.
 
 
 6
 (A) The Medicare Program:
 
 1. "Reasonable Cost" Reimbursement:
 
 7
 Part A of the Medicare Program, codified at 42 U.S.C. § 1395c et seq. of the Social Security Act ("SSA"), provides the elderly and the disabled with "basic protection against the costs of hospital, related post-hospital, home health services, and hospice care...." 42 U.S.C. § 1395c. Hospitals and other health care providers participating in the Medicare Program generally cannot collect payment for these health services from the Medicare beneficiaries themselves, but must instead obtain reimbursement from HHS in the manner set forth in the Medicare Program.
 
 
 8
 From 1966 to 1982, the Medicare Program reimbursed hospitals and other health care providers for the "reasonable cost" of covered services, which was defined as the "cost actually incurred" exclusive of costs "found to be unnecessary in the efficient delivery of needed health services." Section 1395x(v). Necessary costs included operating costs, which often increased from year to year. Under this regime, hospitals and other health care providers had little incentive to curb operating costs and render services more economically, for the federal government bore the financial burden of the increases.[2]
 
 
 9
 In 1982, Congress determined that the Medicare Program should be modified to provide hospitals with better incentives to render services more economically. Accordingly, in the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") Congress amended the SSA by imposing a ceiling on the rate of increase of inpatient operating costs recoverable by a hospital.[3]
 
 
 10
 Under TEFRA, the rate-of-increase limit was computed according to a hospital's "target amount" which, in turn, was calculated according to a hospital's cost reporting or "base" period. The statute provided: " 'target amount' means with respect to a hospital for a particular 12-month cost reporting period--(i) in the case of the first reporting period for which this subsection is in effect, the allowable operating costs of inpatient hospital services ... recognized ... for such hospital for the preceding 12-month cost reporting period." Section 1395ww(b)(3)(A). For each reporting period subsequent to the initial period, the target amount was increased by a specified percentage. Section 1395ww(b)(3)(A). Under this system, hospitals were obligated to absorb operating costs in excess of their target amounts, but they received bonuses if their operating costs were less than their targeted amounts. Section 1395ww(b)(1)(A).
 
 
 11
 TEFRA additionally set forth specific exceptions and adjustments applicable to the rate-of-increase limits. For example, and of great significance here, section 1395ww(b)(4)(A) directed the Secretary to "provide for an exemption from, or an exception and adjustment to, the [rate-of-increase] method ... where events beyond the hospital's control or extraordinary circumstances ... create a distortion in the increase in costs for a cost reporting period...." (emphasis supplied). Accordingly, the HCFA[4] promulgated regulations permitting hospitals to modify their target amounts where they have incurred costs "due to extraordinary circumstances" or where "factors ... could result in a significant distortion in the operating costs of inpatient hospital services." 42 C.F.R. § 405.463(g)(2) and (h), redesignated 42 C.F.R. §§ 413.40(g)(2) and (h). In addition, section 1395ww(b)(4)(A) authorized the Secretary to "provide for such ... other exemptions from, and exceptions and adjustments to, [the rate-of-increase] method as the Secretary deems appropriate...."
 
 2. Prospective Payment System:
 
 12
 In 1983 Congress again amended the SSA, replacing the newly-instituted TEFRA system with the PPS. The purpose of the new prospective system, which constituted a far more radical reform of inpatient operating cost reimbursement than did TEFRA, was "to reform the financial incentives hospitals face, promoting efficiency ... by rewarding cost/effective hospital practices." H.R.Rep. No. 25, 98th Cong., 1st Sess. 132 (1983), reprinted in 1983 U.S.C.C.A.N. 143, 219, 351. Under this system, which remains in effect, hospitals and other health care providers are reimbursed on the basis of prospectively determined national and regional rates rather than reasonable operating costs. This system classifies all Medicare patients into one of approximately 470 "diagnosis-related-groups" ("DRGs") and establishes fixed rates for each DRG.[5] When a hospital's actual operating costs exceed its federally prescribed limit for the given DRG, the hospital must absorb the difference. Conversely, if a hospital's costs are lower than the federal rates, the hospital retains the difference.
 
 
 13
 While Congress was anxious to restrain costs, it recognized that a sudden break from the "reasonable cost" method of reimbursement could pose financial hardship for many health care providers. Thus, "to minimize disruption that might otherwise occur because of sudden changes in reimbursement levels," Congress established a three-year transition period between the TEFRA system and the PPS system, and later extended this transition period for an additional year. S.Rep. No. 23, 98th Cong., 1st Sess. 53 (1983), reprinted in 1983 U.S.C.C.A.N. 143, 193.
 
 
 14
 The statutory provisions in effect during the transition period required the federal government to reimburse hospitals for inpatient hospital services according to a "blended" rate, which consisted of two elements. The first element of this rate, the hospital-specific portion ("HSP"), was a specified percentage of "the hospital's target amount for the cost reporting period." Section 1395ww(d)(1)(A)(i)-(ii). The statute further provided that the hospital's "target amount" would be calculated in the manner set forth in TEFRA.[6] The second element of the blend was the federally prescribed rate.
 
 
 15
 During the first transition year under the PPS, the HSP comprised 75% of the blend, while the prospective rate equalled 25%. During the second year, the HSP was reduced to 50% of the rate, and the prospective rate equalled 50%. In the third year, the HSP was 45% while the prospective rate was 55%. In the last year, the HSP was 25% and the prospective rate was 75%. After the transition period, the PPS required the government to reimburse hospitals solely on the basis of the prospective federal rate.
 
 
 16
 Section 1395ww(d)(5) sets forth various exceptions to the reimbursement rates prescribed under the PPS.[7] In addition, this section endows the Secretary with general authority to "provide by regulation for such ... exceptions and adjustments to ... payment amounts under this subsection as the Secretary deems appropriate." 42 U.S.C. § 1395ww(d)(5)(I). But section 1395ww(d) contains no provision like that in 1395ww(b)(4)(A), which directed the Secretary to adjust reimbursement amounts where "events beyond the hospital's control or extraordinary circumstances ... create a distortion in the increase in costs for a cost reporting period." Accordingly, the HCFA has not promulgated any regulation permitting hospitals to be reimbursed for an increase in operating costs due to extraordinary circumstances that took place after the hospital's base year.
 
 
 17
 (B) The Dispute:
 
 
 18
 As we have already described, Sacred Heart completed construction of an additional facility to retain its hospital license and its accreditation in June of 1983. Sacred Heart operates on a fiscal year that ends on June 30. Under section 1395ww(b)(3)(A), which set forth the procedure for calculating a hospital's target amount for inpatient operating costs, Sacred Heart's base year was fiscal 1983. By June 30, 1983, however, Sacred Heart had only utilized the new facility for two weeks and had not incurred substantial operating costs in that brief period.
 
 
 19
 On June 26, 1984, Aetna Life Insurance Company, Sacred Heart's fiscal intermediary, issued to Sacred Heart its Notice of Base Period Costs and Target Amount for Sacred Heart's first year under the PPS. Although the Intermediary included in this calculation operating costs incurred by the Hospital during the two weeks the new facility was used, it did not include any operating costs incurred after the 12-month base period.
 
 
 20
 On September 21, 1984, Sacred Heart asked the Intermediary to increase its HSP to reflect the additional operating costs associated with the new facility. The Intermediary consulted with the HCFA which, relying on the fact that the PPS did not expressly permit retroactive revision of the target amount based on changes that took place subsequent to a hospital's base year, determined that the increase could not be allowed. Further, the HCFA concluded that none of its regulations allowed for the increase requested. On December 2, 1985, the Intermediary informed Sacred Heart of HCFA's decision.[8]
 
 
 21
 (C) The Administrative Hearing:
 
 
 22
 On October 10, 1986, Sacred Heart appealed the Intermediary's decision to the Board, an administrative body charged with reviewing contested reimbursement determinations by fiscal intermediaries. Section 1395oo(a). In that appeal, Sacred Heart again requested that its HSP be adjusted to reflect the increased operating costs it incurred after its base year due to the new facility.[9]
 
 
 23
 On August 1, 1989, the Board determined that neither the governing statute nor the HCFA's regulations permitted the Intermediary to adjust Sacred Heart's HSP to include operating costs it incurred after its base year. On September 5, 1989, the Administrator of HCFA, sua sponte, declined to review the Board's decision.
 
 
 24
 (D) The District Court Proceeding:
 
 
 25
 On September 28, 1989, Sacred Heart commenced this action against the Secretary seeking judicial review of the Board's decision.[10] Sacred Heart contended that the "extraordinary circumstances" provision set forth in section 1395ww(b)(4)(A) retained vitality after the passage of the PPS, while the Secretary urged that, because the PPS did not explicitly refer to that provision, this omission evinced a congressional intent to abandon it. Although the district court conceded that the statute and the regulations implementing it "do not expressly provide for the sort of adjustment which plaintiff seeks," it held that:
 
 
 26
 By electing to maintain during the transition period the method for computing allowable costs under the former system, Congress signaled its intent to incorporate the provisions of the former system that give it the flexibility that was its hallmark. Congress 'clearly signaled an intent to keep certain elements of the former system in place at least temporarily--elements that would in the end be abandoned altogether, but which were nevertheless included in order to minimize financial disruptions.'
 
 
 27
 App. at 23 (quoting Georgetown University Hospital v. Bowen, 862 F.2d 323, 327 (D.C.Cir.1988)).
 
 
 28
 Accordingly, it ordered the Secretary to modify Sacred Heart's target rate to take into consideration operating costs Sacred Heart had incurred after its base year due to the new facility. This appeal followed.III. DISCUSSION
 
 A. THE PARTIES' CONTENTIONS:
 
 29
 This case involves a question of statutory interpretation. Sacred Heart asserts that, although section 1395ww(d) does not indicate that a hospital's target amount, as determined under section 1395ww(b)(3)(A), must be modified pursuant to section 1395ww(b)(4)(A), there are four indications that Congress intended such a modification. First, Sacred Heart states that section 1395ww(b)(4)(A) must be read in conjunction with section 1395ww(b)(3)(A) to insure that the hospital's "target amount" is calculated properly. Second, Sacred Heart contends that the legislative history of the PPS supports its view that the PPS incorporates section 1395ww(b)(4)(A), since "Congress created the four-year PPS transition period to 'soften the blow' to hospitals that would have been harmed by an immediate transition to the PPS.... Congressional intent to 'soften the blow' was important because it shows that Congress would keep as much of the old system as feasible." Third, Sacred Heart notes that the HCFA had previously construed the PPS as encompassing section 1395ww(b)(4)(A). Fourth, Sacred Heart contends that the relevant caselaw concerning this issue supports its assertion that Congress intended to incorporate section 1395ww(b)(4)(A) into the PPS reimbursement scheme.
 
 
 30
 In addition, it is Sacred Heart's view that, even if the Secretary's interpretation of the statute is correct, Sacred Heart "still should prevail since the agency's failure to grant relief to Sacred Heart when it has granted relief to hospitals in indistinguishable circumstances is capricious, by definition, and would be an impermissible abuse of discretion."
 
 
 31
 The Secretary's response is straightforward. He contends that the plain meaning of the statute clearly indicates that a hospital's target rate need not be adjusted for "extraordinary circumstances" because the PPS contains no reference to section 1395ww(b)(4)(A), although it does refer to section 1395ww(b)(3)(A). In the Secretary's view, if Congress had intended to incorporate section 1395ww(b)(4)(A) into the PPS, it would have so specified. The Secretary further argues that, even if the congressional intent on this issue were ambiguous, we must defer to HCFA's statutory interpretation as it is charged with administering the Medicare Program. Because the HCFA's interpretation is reasonable, this Court cannot substitute a different, though arguably reasonable, reading of the statute.
 
 B. STANDARD OF REVIEW:
 
 32
 On review of the district court's grant of summary judgment, "[t]he appellate court is required to apply the same test the district court should have utilized initially." Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). See Tiernan v. Devoe, 923 F.2d 1024, 1032 (3d Cir.1991). Because we are only authorized to review final judgments of the district court, 28 U.S.C. § 1291, denials of summary judgment are ordinarily not appealable. Chinchello v. Fenton, 805 F.2d 126, 129 (3d Cir.1986). However, when an appeal from a denial of summary judgment is raised in tandem with an appeal of an order granting a cross-motion for summary judgment, we have jurisdiction to review the propriety of the denial of summary judgment by the district court. Nazay v. Miller, 949 F.2d 1323, 1328 (3d Cir.1991); Beck v. Reliance Steel Products Co., 860 F.2d 576, 581 (3d Cir.1988); First National Bank v. Lincoln National Life Insurance Co., 824 F.2d 277, 281 (3d Cir.1987). In addition, where, as here, the facts are uncontroverted, we are free to enter an order directing summary judgment in favor of the appellant. Nazay, 949 F.2d at 1328; First National, 824 F.2d at 281.
 
 
 33
 The Supreme Court in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), set forth the standards of judicial review of an agency's construction of the statute which it administers. It noted that a court, in this situation,is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 34
 Id. at 842-43, 104 S.Ct. at 2781-82 (footnotes omitted).
 
 
 35
 The Court further indicated that the reviewing court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." Id. at 843 n. 11, 104 S.Ct. at 2782 n. 11. Moreover, the Court observed that, when Congress expressly delegates authority to an administrative body to fill in the gaps of a given statute, the regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Id. at 844, 104 S.Ct. at 2782 (footnote omitted). Accord, Markowitz v. Northeast Land Co., 906 F.2d 100, 105 (3d Cir.1990).[11]
 
 
 36
 Sacred Heart, citing Morton v. Ruiz, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974), asserts that the HCFA's interpretation of the statute is not entitled to deference because the HCFA has not consistently endorsed the interpretation it espouses here.[12] It notes that the agency has made at least two statements in the Federal Register indicating that it believed that "extraordinary circumstances" modifications were permissible under the PPS, and observes that the agency has granted the relief Sacred Heart requests in this case to other hospitals based on similar facts. Finally, Sacred Heart contends that this Court has indicated that it will "not accept a revision in administrative interpretation when it 'flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute.' " Mazza v. Secretary of Health and Human Services, 903 F.2d 953, 959 (3d Cir.1990) (quoting General Electric Co. v. Gilbert, 429 U.S. 125, 142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976)).[13]
 
 
 37
 We are not persuaded by Sacred Heart's attempts to dodge the standard of review. While it is generally true that less deference should be accorded to administrative interpretations that lack consistency, an agency is not locked into the first interpretation it espouses. Instead, the agency must offer a "reasoned justification" for the change in its interpretation of a statute or a modification of its policy. See Mazza v. Secretary of Health and Human Services, 903 F.2d at 959.
 
 
 38
 Here, the Secretary contends that, although the HCFA may have previously interpreted the statute improperly, its current construction is in full accord with the language of the PPS and the legislative intent that motivated its enactment. This surely constitutes a "reasoned justification" for the Secretary's departure from its prior interpretation. Accordingly, the Secretary's interpretation of the statute must be upheld if this Court determines that it is reasonable. Moreover, the HCFA's regulations implementing the authority delegated to it by the Secretary cannot be disturbed unless they are arbitrary and capricious.[14]
 
 C. PLAIN MEANING:
 
 39
 As we recently stated in Velis v. Kardanis, 949 F.2d 78, 81 (3d Cir.1991), "[i]t is axiomatic that statutory interpretation properly begins with the language of the statute itself, including all of its parts. There is no need to resort to legislative history unless the statutory language is ambiguous." Thus, we initially look to the statute for our result.
 
 
 40
 Section 1395ww(d) provides for reimbursement to a hospital for its inpatient operating costs according to a combination of the hospital's HSP rate and its DRG rate. Section 1395ww(d)(1)(A)(i)(I) further provides that a hospital's HSP or target rate will be calculated in the manner set forth in section 1395ww(b)(3)(A). Section 1395ww(b)(3)(A), in turn, provides:
 
 
 41
 Except as provided in subparagraphs (C), (D), and (E) ... 'target amount' means, with respect to a hospital for a particular 12-month cost reporting period--
 
 
 42
 (i) in the case of the first such reporting period for which this subsection is in effect, the allowable operating costs of inpatient hospital services (as defined in subsection (a)(4) of this section) recognized under this subchapter for such hospital for the preceding 12-month cost reporting period,
 
 
 43
 increased by the applicable percentage increase under subparagraph (B) for that particular cost reporting period.
 
 
 44
 Significantly, section 1395ww(b)(3)(A) does not expressly refer to section 1395ww(b)(4)(A), which constitutes an exception to the target amount method set forth in section 1395ww(b)(3)(A). The exception states:
 
 
 45
 The Secretary shall provide for an exemption from, or an exception and adjustment to, the method under this subsection for determining the amount of payment to a hospital where events beyond the hospital's control or extraordinary circumstances, including changes in the case mix of such hospital, create a distortion in the increase in costs for a cost reporting period (including any distortion in the increase in costs for the base period against which such increase is measured). The Secretary may provide for such other exemptions from, and exceptions and adjustments to, such method as the secretary deems appropriate, including the assignment of a new base period which is more representative, as determined by the Secretary, of the reasonable and necessary cost of inpatient services....
 
 
 46
 In addition, section 1395ww(d) does not refer to section 1395ww(b)(4)(A). Rather, section 1395ww(d)(5) sets forth its own exceptions to the amount a hospital may be reimbursed for its inpatient operating costs under the PPS. See section 1395ww(d)(5)(A)-(H). That section does not include a provision for an upward modification of a hospital's target rate in the event of "extraordinary circumstances."[15]
 
 
 47
 Moreover, section 1395ww(d)(5)(I), like section 1395ww(b)(4)(A), endows the Secretary with authority to "provide by regulation for such other exceptions and adjustments to such payment amounts under this subsection as the Secretary deems appropriate."[16] Accordingly, the HCFA has promulgated regulations in the exercise of the power delegated to it by the Secretary; these regulations are codified at 42 C.F.R. §§ 412.71 and 412.72. Section 412.71 provides that a hospital's base year costs can be modified to include malpractice insurance, certain medical services, and FICA taxes. Plainly, none of these provisions provides a basis to modify Sacred Heart's operating costs. Section 412.72 sets forth four bases for an intermediary to modify a hospital's base-year costs to include additional costs: "inadvertent omissions," "correction of mathematical errors of calculations," "recognition of additional costs," and "successful appeal." Although section 412.72(a)(3), entitled "recognition of additional costs," provides the most superficially appealing means to modify the Hospital's base-year figure, that section merely permits modification of a hospital's base-year figure to include allowable costs. Costs incurred by a hospital after its base year are not allowable.[17]
 
 
 48
 Thus, the plain language of the statute and the regulations implementing it support the Secretary's view that the PPS does not include an "emergency circumstances" caveat.[18]D. LEGISLATIVE HISTORY:[19]
 
 
 49
 Although the legislative history is barren of commentary directly revealing Congress' intent concerning the incorporation of section 1395ww(b)(4)(A) into the PPS, the legislative history does indicate that Congress enacted the PPS to move away from the retrospective reimbursement system and replace it with a prospective system with fixed national rates.[20] This intent supports the view that an increase in a given hospital's actual operating costs should not be considered unless the statute or the regulations expressly so provide.[21]
 
 
 50
 Second, although Congress created the transition period to "soften the blow" to hospitals that would have been injured by an immediate transition to the PPS system, this does not signify, as Sacred Heart asserts, that Congress intended to "keep as much of the old system as feasible." Indeed, such a view is completely insupportable, since Congress enacted the PPS precisely to avoid the problems associated with the old reimbursement regime.[22]
 
 
 51
 E. THE SECRETARY'S PRIOR INTERPRETATION OF THE STATUTE:
 
 
 52
 Sacred Heart additionally relies on the HCFA's prior interpretations of the PPS to support its contention that Congress intended to incorporate section 1395ww(b)(4)(A) into the PPS. It notes that the HCFA stated in the preamble to the final PPS regulations:
 
 
 53
 We believe the Congress intended to assure, by giving us broad authority under the law to provide for exceptions, exclusions, and adjustments, that some hospitals are not advantaged or disadvantaged by unique circumstances in their base year that do not reflect their usual cost of operation per case. This intent is indicated in Section 1886(b)(4)(A) of the Act.
 
 
 54
 49 Fed.Reg. 261 (Jan. 3, 1984).
 
 
 55
 According to Sacred Heart, because the HCFA espoused this interpretation just after the statute was enacted, it is entitled to greater weight than its present interpretation.[23]
 
 
 56
 Further, Sacred Heart asserts that the HCFA proposed to revise section 412.72 so that the regulation would specifically permit it to consider operating costs incurred by the hospital after the hospital's base year. Sacred Heart argues that, in proposing this revision, the HCFA stated that its then-current policy was to consider these additional costs:
 
 
 57
 Our current policy is to revise the hospital-specific portion of the prospective payment rate to take into account exceptions, exemptions and adjustments granted under §§ 405.460 and 405.463 to the extent that they apply to base year costs....
 
 
 58
 Under current operating procedures, it is the onset of the event that caused the distortion that dictates which period's costs are adjusted. Thus, if a cost distorting event occurs in the base year, operating costs in the base year (for purposes of application of the rate-of-increase ceiling) are adjusted.
 
 
 59
 51 Fed.Reg. 8208, 8210 (Mar. 10, 1986).
 
 
 60
 The Secretary responds that, although the HCFA originally cited section 1395ww(b)(4)(A) as a source of authority for adjusting base-period costs during the PPS transition period, the HCFA later abandoned this reference in a subsequent Federal Register. In its later statement, the HCFA explained that its regulations were promulgated "in accordance with section 1886(d)(5)(C)(iii)," the provision endowing the Secretary with discretionary authority to provide for exceptions and exemptions to the PPS reimbursement amount. Further, the Secretary notes that the HCFA's March 10, 1986, statements, indicating that the agency's practice was to modify a hospital's target amount, concerned only changes that took place during the hospital's base year. The Secretary argues that "the HCFA made clear[ ] [that] '[e]xceptions, exemptions, or adjustments granted for periods subsequent to the base year do not change the hospital-specific portion of the prospective payment rate since neither base year costs nor the target amount is altered by such action.' " (quoting 51 Fed.Reg. 8208, 8210).
 
 
 61
 The Secretary's position has greater force. The HCFA should not be bound by its previous interpretation of the PPS, though espoused shortly after the statute was enacted, where the agency modified its interpretation upon a more thorough examination of the statute.[24] In addition, when the HCFA's comments cited by Sacred Heart are read in context, it appears that the HCFA's practice was to permit modifications of a hospital's target rate for increases in operating costs incurred during the hospital's base year, not after it.
 
 F. JURISPRUDENCE:
 
 62
 Notwithstanding our conclusion that the result in this case is clear we do observe that it appears that every court that has directly considered the issue has determined that Congress intended to incorporate section 1395ww(b)(4)(A) into the PPS. For example, in Newport Hospital and Clinic, Inc. v. Sullivan, No. 88-2490-LFO, 1990 WL 179953, at (D.D.C. Sept. 24, 1990), the Secretary advanced the same argument it does here, but the court rejected it, concluding:
 
 
 63
 Subsection (b)(3)(A) defines 'target amount' as the allowable costs as set forth in yet another subsection. Subsection (b)(4)(A) establishes exceptions to subsection (b), including (b)(3)(A). For this reason, subsection (b)(3)(A) cannot be cleanly extracted from its statutory environment even if Congress neglected to refer to (b)(4)(A) explicitly.
 
 
 64
 In The Methodist Hospital v. Sullivan, No. 90-1871, 1991 WL 263110, at (D.D.C. Sept. 20, 1991), the district court similarly declined to adopt the Secretary's interpretation of the PPS noting:
 
 
 65
 [T]he structure, specific wording, and legislative history of the statute suggest that Congress did mean to include (b)(4)(A) in the phase-in period calculations. The whole point of the phase-in provisions is to implement PPS gradually, by blending the old and new payment systems; and the old system included (b)(4)(A)
 
 
 66
 * * * * * *
 
 
 67
 [B]y all outward appearances, the transition period was designed to soften the blow dealt by the new system to hospitals, but, according to the Secretary's interpretation, this period would effectively become a Trojan horse inside which a further cost-cutting measure was hidden.[25]
 
 
 68
 With all due respect, we regard these interpretations as flawed. First, the PPS does not refer to section 1395ww(b)(4)(A), although it does refer to section 1395ww(b)(3)(A). This omission is significant, because if Congress had intended to retain the "extraordinary circumstances" provision, it would have so indicated. Second, section 1395ww(b)(3)(A) does not refer to section 1395ww(b)(4)(A), although it does refer to subparagraphs (C), (D) and (E), which constitute exceptions from the target amount method set forth in (b)(3)(A). Thus, by section 1395ww(b)(3)(A)'s own terms, there is no need to incorporate section 1395ww(b)(4)(A) to ensure a proper calculation of a hospital's target amount. Third, the PPS contains a provision endowing the Secretary with authority to promulgate regulations concerning exceptions to the reimbursement system. Therefore, there is no need to incorporate a provision in section 1395ww(b)(4)(A) which endows the Secretary with arguably lesser authority to deviate from the target amount method set forth in section 1395ww(b)(3)(A). Fourth, these interpretations are inconsistent with Congress' intent to move away from the retrospective reimbursement system and create a forward-looking system with fixed rates.[26]IV. CONCLUSION
 
 
 69
 In conclusion, the HCFA's position that the PPS does not incorporate TEFRA's "extraordinary circumstances" exception is not unreasonable. Neither the PPS, nor section 1395ww(b)(3)(A) expressly refers to section 1395ww(b)(4)(A). Further, the PPS contains its own provision endowing the Secretary with authority to create exceptions to the amount of reimbursement that would otherwise be afforded under the PPS; the HCFA, exercising the power delegated to it by the Secretary, has not promulgated a regulation permitting modifications for emergency circumstances.
 
 
 70
 In addition, the legislative history confirms Congress' intent to break from the retrospective system of reimbursement; accordingly, exceptions for increases in a provider's HSP due to increases in its actual operating costs should not be permitted absent clear congressional intent to do so. Finally, although the HCFA espoused a different interpretation of the PPS previously, it has offered a reasonable justification for its new position.
 
 
 71
 For these reasons, the judgment of the district court will be reversed and the matter will be remanded to the district court for entry of a summary judgment in favor of the Secretary.[27]
 
 
 
 [1]
 For example, Sacred Heart still operated a number of wards or rooms with four beds
 
 
 [2]
 Section 223 of the Social Security Amendments of 1972 imposed some limits on reimbursement for operating costs. See Pub.L. No. 92-603, § 223, reprinted in 1972 U.S.C.C.A.N. 1548, 1627
 
 
 [3]
 TEFRA did not impose a ceiling on the rate of increase of capital costs, which continued to be reimbursed on a reasonable-cost basis. Sections 1395ww(b)(1), 1395ww(a)(4)
 
 
 [4]
 The Secretary delegated his duties with respect to the Medicare Program to the HCFA. The HCFA, in turn, has delegated much of the day-to-day management of the Program to fiscal intermediaries, which are private insurance companies that act as contractors to the Medicare Program. 42 U.S.C. § 1395h
 
 
 [5]
 The federal rate is based on national averages, but is adjusted for local wages. 42 U.S.C. § 1395ww(d)(2)
 
 
 [6]
 Section 1395ww(d)(1)(A)(i)(I) directs the Secretary to use "the hospital's target amount for the cost reporting period (as defined in subsection (b)(3)(A) of this section....)" (emphasis supplied)
 
 
 [7]
 None of these exceptions authorizes an intermediary to adjust a hospital's HSP for extraordinary circumstances. See section 1395ww(d)(5)(A)-(H)
 
 
 [8]
 The Secretary does not dispute that the HCFA could exercise its authority to promulgate an "extraordinary circumstances" exception to a hospital's HSP or its target rate
 
 
 [9]
 Sacred Heart noted that, "[t]he total amount of increased costs directly attributable to the building expansion are $1,185,271."
 
 
 [10]
 Sacred Heart filed two additional complaints covering later transition years but the complaints were consolidated and as a matter of convenience we refer to all three as a single action
 
 
 [11]
 In addition, section 1395oo(f) of the Medicare Program provides that the standard of judicial review set forth in 5 U.S.C. § 706 of the Administrative Procedure Act must apply. That provision makes clear that a reviewing court must defer to an agency's construction of the statute it administers
 
 
 [12]
 In Morton, the Supreme Court held that, "[t]he weight of an administrative interpretation will depend, among other things, upon 'its consistency with earlier and later pronouncements' of an agency." 415 U.S. at 237, 94 S.Ct. at 1075 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944))
 
 
 [13]
 In Mazza, a claimant who filed concurrent claims for SSI and disability benefits appealed from the decision of the Appeals Council which held that claimant's disability benefits could be offset against his potential SSI benefits, although this would result in a denial of claimant's SSI benefits and his accompanying entitlement to Medicaid
 We held that the Social Security Administration's unguided, random processing of concurrent claims for disability and SSI benefits, resulting in a calculation of disability benefits first, but which offset disability benefits against potential SSI benefits so that the claimant was not entitled to SSI benefits and Medicaid, was not entitled to a deferential standard of review.
 
 
 [14]
 Thus, the facts in this case are quite unlike those at issue in Mazza, where the Secretary had "not articulated any reason for changing [its] earlier practice," 903 F.2d at 959, and indeed had contended that "when processing concurrent applications he may freely apply the setoffs in a haphazard fashion." Id. at 958. We elaborate below on the reasonableness of the HCFA's interpretation
 
 
 [15]
 Although Sacred Heart relies on our opinion in Malloy v. Eichler, 860 F.2d 1179 (3d Cir.1988), that case is inapposite. There, we rejected the Secretary's argument that Congress implicitly intended to amend a certain provision in the Medicaid Program because it amended a certain provision in the Aid to Families with Dependent Children ("AFDC") program. We stated, "if Congress chose explicitly to amend the AFDC requirements, the appropriate inference is that it chose to amend only those, not others.... We must assume that Congress was aware of [the Medicaid provision] when it enacted the AFDC amendments ... but chose not to repeal or amend it." Id. at 1185
 Here, in contrast, Congress abandoned the "reasonable cost" system and replaced it with the PPS, an entirely different system. Although Congress chose to enact an interim program to smooth the transition to the PPS, the reasonable cost system did not retain vitality after the passage of the PPS other than to the extent Congress designated.
 
 
 [16]
 Indeed, although the wording of this general provision differs slightly from its predecessor, section 1395ww(b)(4)(A), they both endow the Secretary with authority to prescribe exceptions from the amount that would be awarded under the relevant reimbursement schemes
 Sacred Heart argues that "[e]xceptions to payment is a different and broader proposition than exceptions to the HSP method.... No longer is the Secretary merely allowed to adjust the method for determining the target amount, but he can also adjust any part of the payment determination." This argument is unavailing. If the Secretary can make modifications to the "payments" prescribed under the PPS, which power is arguably broader than the power to make modifications to the method of payment, then there is no need to incorporate this provision of section 1395ww(b)(4)(A).
 
 
 [17]
 Section 412.72(a)(3) states:
 (i) The Intermediary may adjust base-period costs to take into account additional costs recognized as allowable costs for the hospital's base year as the result of any of the following:
 (A) A reopening and revision of the hospital's base-year notice of amount of program reimbursement under §§ 405.1885 through 405.1889 of this chapter.
 (B) A prehearing order or finding issued during the provider payment appeals process by the appropriate reviewing authority under § 405.1821 or § 405.1853 of this chapter that resolved a matter at issue in the hospital's base-year notice of amount of program reimbursement.
 (Emphasis supplied).
 Subsections (C) and (D) which follow further permit a modification of the base-year figure upon action by the Board or an administrative or judicial decision.
 These regulations similarly do not permit Sacred Heart to receive a modification of its base-year figure because of costs incurred after its base year.
 
 
 [18]
 Sacred Heart also argues that, because section 1395ww(d) provides that a hospital's target rate is defined under section 1395ww(b)(3)(A) "without the application of subsection (a) of this section," its failure to specifically exclude section 1395ww(b)(4)(A) evinces Congress' intent to retain that provision. However, as the Secretary notes, this argument is without merit because subsection (a) must be read in conjunction with section 1395ww(b)(3)(A) because it defines one of the relevant terms of the latter provision, namely "allowable costs." Section 1395ww(b)(4)(A) does not define a relevant term contained in section 1395ww(b)(3)(A); rather, it constitutes an exception to the method set forth in that provision. As the Secretary notes, "[s]ection 1886(b)(4)(A) does not affect the definition of 'target amount' " Thus, it is unnecessary to read section 1395ww(b)(4)(A) in conjunction with section 1395ww(b)(3)(A)
 
 
 [19]
 Because the statutory language is plain, there is no need to resort to the legislative history. See Velis v. Kardanis, 949 F.2d at 81. However, inasmuch as the district court relied upon the legislative history in determining that the PPS incorporated section 1395ww(b)(4)(A), we examine it
 
 
 [20]
 See, e.g., H.R.Rep. No. 25, 98th Cong., 1st Sess. 132 (1983), reprinted in 1983 U.S.C.C.A.N. 219, 351; S.Rep. No. 23, 98th Cong., 1st Sess. 47 (1983), reprinted in 1983 U.S.C.C.A.N. 143, 187
 
 
 [21]
 The Secretary notes that the House Committee on Ways and Means commented that: "[t]he portion of a hospital's payment determined on its own cost base [during the PPS transition period] would be calculated as though the hospital's target amount under the 1982 TEFRA legislation were its payment amount (that is, ... without regard to the exceptions, exemptions and adjustments which may have been authorized under TEFRA for that year.)" H.R.Rep. No. 25, 98th Cong., 1st Sess. 136 (1983), reprinted in 1983 U.S.C.C.A.N. 219, 355
 However, Sacred Heart points out that the Senate rejected the proposal to exclude all exceptions authorized under TEFRA. Further, the Conference Report indicates that the "no exceptions" provision was deleted:
 The conference agreement follows the Senate amendment. The managers note that during the phase-in period, some portion of the prospective payment rate will be related to each hospital's own experience in a base cost reporting year. The managers recognize that, in some cases, the Secretary will have to use estimates to adjust some portions of the hospital's base year experience to make it comparable to inpatient operating costs that will be paid under the prospective system--e.g., FICA taxes that would have been paid if the hospital had been in the social security system or the adjustment needed to exclude the nursing differential which is no longer payable.
 H.R.Conf.Rep. No. 47, 98th Cong. 1st Sess. 181-82 (1983), reprinted in 1983 U.S.C.C.A.N. 404, 471-72.
 These comments do not clearly weigh in favor of either party. They do not, as the Secretary asserts, establish that Congress did not wish to retain any of the exceptions to a hospital's target rate under TEFRA, as the Conference Report expressly rejected that proposal. Nor do the statements indicate that Congress intended to retain the "exceptional circumstances" provision, since that exception is not referred to in the Conference Report.
 
 
 [22]
 Moreover, if Congress had desired, it could have retained the old system in toto
 
 
 [23]
 Sacred Heart cites Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), where the Court noted, "[p]articularly is [judicial] respect due when the administrative practice at stake involves a contemporaneous construction of a statute by the [people] charged with the responsibility of setting its machinery in motion...." (quoting Power Reactor Development Co. v. International Union of Electrical, etc., 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 81 S.Ct. 1529 (1961))
 
 
 [24]
 This same logic holds true with respect to Sacred Heart's argument that, even if the Secretary's construction of the statute is correct, the government should reimburse Sacred Heart for its increased operating costs incurred after its base year because it has done so for other hospitals. To withhold relief, Sacred Heart asserts, is "capricious by definition." As the Secretary correctly notes, "[n]o rule of administrative law requires the Secretary to extend the same erroneous treatment to Sacred Heart and other hospitals, thereby turning an isolated error into a uniform misapplication of the law." The Secretary's conduct cannot be deemed arbitrary and capricious when it is based upon a reasonable interpretation of the statute he is charged with enforcing
 Sacred Heart additionally contends that, to the extent that regulation 405.474(b)(2)(i) permits an intermediary to exclude one-time, non-recurring costs from a hospital's target rate, but does not permit the intermediary to increase a hospital's target rate in the converse scenario, it is one-sided and unfair. It further observes that, in the preamble to the final regulations, the HCFA indicated that, "Congress intended to assure, by giving us broad authority under the law to provide for exceptions, exclusion and adjustments, that some hospitals are not advantaged or disadvantaged by unique circumstances in their base year." 49 Fed.Reg. 261 (January 3, 1984). Sacred Heart asserts that the one-sided nature of the regulation conflicts with the HCFA's own stated purpose of the regulations.
 However, the regulation at issue is not one-sided. Rather, it permits an intermediary to modify a hospital's target rate upwards to take into account revenue offsets. More importantly, the HCFA has broad authority to prescribe regulations governing the Medicare Program within the framework of the statutory provisions. The statute does not require the HCFA to promulgate the regulation Sacred Heart requests, and its failure to do so is not arbitrary and capricious.
 
 
 [25]
 Although other courts have awarded relief similar to that which Sacred Heart seeks here, they did not specifically address the argument advanced here because the Secretary did not dispute the reimbursement. See, e.g., Greenville Hospital System v. Heckler, 642 F.Supp. 15, 17 (D.S.C.1985), vacated, Medicare & Medicaid Guide (CCH) p 36,072, 1986 WL 68493 (D.S.C.1986); Redbud Hospital District v. Heckler, No. C-84-4382-MHP, slip op. at 18, 1984 WL 2857 (N.D.Cal. June 14, 1985) (the Secretary "does not dispute that this provision is directed to the calculation of the target amount under the reimbursement system in effect for 1983-84, which directly translates into the PPS hospital-specific rate."), vacated on other grounds, 473 U.S. 1308, 106 S.Ct. 1, 87 L.Ed.2d 677 (1986)
 
 
 [26]
 This interpretation of the PPS is consistent with the decision of the United States Court of Appeals for the District of Columbia Circuit in Georgetown University Hospital v. Bowen, 862 F.2d 323. There, the Court stated that, by enacting the four-year transition period, Congress "clearly signalled an intent to keep certain elements of the former system in place at least temporarily." Id. at 327 (emphasis supplied). Further, in determining the definition of "allowable operating costs" under TEFRA, the Court referred to the statutory language, which provided that such costs were those incurred in the "preceding 12-month cost reporting period." Id. at 326
 In light of these determinations, there is no need to reach Sacred Heart's contention that the increase in inpatient operating costs due to the new facility constitutes an emergency circumstance within the meaning of section 1395ww(b)(4)(A).
 
 
 [27]
 Judge Seitz agrees that the present state of the law dictates the result here reached. However, he believes that, if administratively permissible under the Act, a kinder, gentler and more equitable administration of the Act would justify the granting of administrative relief in the present situation. He so believes because (1) the Secretary did not oppose reimbursement in some earlier cases on the ground now asserted, thus resulting in invidious treatment here, (2) the factors that caused the delay that prejudiced the Medical Center were not its fault and (3) to grant relief in this relatively sui generis situation would not impede the prospective system incorporated in PPS