

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-15-2002

# Robert Wood Johnson v. Secretary HHS

Precedential or Non-Precedential: Precedential

Docket No. 01-2555

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Robert Wood Johnson v. Secretary HHS" (2002). *2002 Decisions.* Paper 390.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/390

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———————

No. 01-2555

———————

ROBERT WOOD JOHNSON
UNIVERSITY HOSPITAL,
a Non-Profit Corporation,

Appellant

v.

TOMMY G. THOMPSON,
UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES

———————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 01-cv-01897)
District Judge:  Hon. William H. Walls

———————

Argued March 5, 2002

Before:  SLOVITER, AMBRO and SHADUR,* Circuit Judges

(Filed:  July 12, 2002)

———————

———————

* Hon. Milton I. Shadur, United States Senior District Judge for the Northern
District of Illinois, sitting by designation.

Robert L. Roth          (Argued)
Crowell & Moring
Washington, D.C.  20004

        Attorney for Appellant

Robert J. Cleary
  United States Attorney
Susan Handler-Menahem          (Argued)
  Assistant United States Attorney
Office of United States Attorney
Newark, N.J.  07102

        Attorneys for Appellee

———————————

OPINION OF THE COURT

———————————

SLOVITER, Circuit Judge.

        Robert Wood Johnson University Hospital (Hospital), which is located in New Brunswick, New Jersey, sought reimbursement from Medicare for the Federal Fiscal Year (FFY) 2002 using the average hourly wage (a component of the reimbursement rate) of hospitals located in New York City, 12 miles away, with which it competes for its staff. There is a procedure under Medicare for reclassification of a hospital into an adjacent metropolitan statistical area (MSA) so that the hospital can use that MSA's higher reimbursement rate, provided the hospital meets certain criteria.  One of those criteria is that the average hourly wage of the hospital seeking reclassification must be 84% of that of the hospitals in the area to which it seeks reclassification.  The Hospital did not meet this criterion (almost, but not quite).  To satisfy the 84% criterion, it sought to have the average

2

hourly wage of the New York City hospitals reduced by interpreting a statutory provision to require inclusion of the average hourly wage of the hospitals located in Orange County, New York. It was unsuccessful in this attempt, and appeals. As will soon be seen, the statutory issues presented by this appeal are much more complex than suggested by this simplified introduction.

## I.

## BACKGROUND

A. Medicare Generally

Medicare, established under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq. (2001), provides a system of federally-funded health insurance for eligible elderly and disabled individuals. Under the Medicare statute, hospitals and other health care providers enter into written provider agreements with the Secretary of Health and Human Services (Secretary) in order to render services to Medicare beneficiaries and receive reimbursement. § 1395cc.

B. Provider Payment System

Most health care providers which have entered into provider agreements with the Secretary, as has the Hospital, are reimbursed through the Prospective Payment System (PPS). This system reimburses hospitals not for their actual incurred costs but for costs based on prospectively fixed rates for each category of treatment. § 1395ww(d). Concerned about escalating Medicare expenditures, Congress designed the PPS to encourage providers to be more efficient and reduce operating costs by reimbursing them

3

with a standard amount for each service regardless of the cost actually incurred. See

Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1227 (D.C. Cir. 1994) (citing

H.R. Rep. No. 98-25, at 132 (1983), reprinted in 1983 U.S.C.C.A.N. 219, 351; S. Rep. No.

98-23, at 47 (1983), reprinted in 1983 U.S.C.C.A.N. 143, 187).

Hospitals receive payment for the services they perform on Medicare beneficiaries

based upon the "diagnosis related group" (DRG) within which the service falls. 42 C.F.R. §

412.60 (2001). The payment rates for the upcoming federal fiscal year (FFY) for each

DRG are published in the Federal Register, first in the form of a proposed rule and then in

the form of a final rule published on or about August 1 for the FFY beginning on October 1

of that year. 42 U.S.C. § 1395ww(d)(6); 42 C.F.R. § 412.8. This system notifies hospitals

in advance of the amount of payment they should expect to receive per patient for each

DRG.

In order to account for wide variations in the cost of labor across the country, the

amount of a hospital's payment under the PPS will vary depending on its location. First,

hospitals are assigned a standardized rate based on whether they are located in a county in a

"large urban," "urban," or "rural" area. See Athens Cmty. Hosp., Inc. v. Shalala, 21 F.3d

1176, 1177 (D.C. Cir. 1994). A wage area in a "large urban" or "urban" location is known

as a Metropolitan Statistical Area (MSA). After calculating the standardized rate based on

the area, the hospital's payment rates are computed by adjusting the standardized amount by

a "wage index" to account for area wage differences. 42 U.S.C. § 1395ww(d)(3)(E).

The wage index is updated each year based on hourly wage data collected from the

4

hospitals.  Each hospital provides the Secretary with data including the total salaries paid to and hours worked by its employees. § 1395ww(d)(3)(E).  The Secretary computes the average hourly wage for a labor market area by adding the total of the salaries and fringe benefits paid by the hospitals within that area, and dividing that figure by the total number of hours worked.  Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2001 Rates, 65 Fed. Reg. 47,054, 47,074-76 (Aug. 1, 2000) (to be codified at 42 C.F.R. pts. 410, 412, 413 & 485).  The Secretary uses this data to create the wage index for each geographic area.  The wage index compares the average hourly wage for hospitals in a given geographic area with the national average hourly wage, which in turn determines the payment rate above or below the national average at which a hospital is reimbursed.  Id.  The wage index for an area generally applies to all hospitals physically located within that geographic area.  Thus, the wage index has a significant effect on the amount of reimbursement a hospital receives.

C.  Geographic Reclassification

The system described above, while appropriate in most instances, yielded inequitable results for some hospitals.  In some cases, a hospital in one area competed for the same labor pool as hospitals in a nearby, larger urban area but received a lower reimbursement because the wage index was lower for the area in which it was geographically located.  Because this situation resulted in some hospitals being underpaid for their labor costs, Congress amended the Medicare Act in order to allow a hospital to seek reclassification from its geographically-based wage area to a nearby wage area for

5

payment purposes if it meets certain criteria. 42 U.S.C. § 1395ww(d)(10); see also Athens, 21 F.3d at 1177-78 (explaining history of geographic reclassification statute). Reclassification allows a hospital to use the wage index of the nearby area to determine the PPS payments for that year. Reclassifications are temporary, and hospitals that qualify must apply every three years. § 1395ww(d)(10)(D)(v).[1]

Congress established the Medicare Geographic Classification Review Board (MGCRB) to pass upon applications for geographic reclassification according to certain standards and guidelines. § 1395ww(d)(10). Congress gave the Secretary the authority to formulate the guidelines to be used by the MGCRB. § 1395ww(d)(10)(D). Most of the applicable guidelines are published at 42 C.F.R. § 412.230 et seq.

Under the guidelines, for an urban hospital, such as the Hospital, to qualify for reclassification, it must submit its average hourly wage data, and that data must demonstrate, inter alia, that the hospital's average hourly wage equals at least 84% of the average hourly wage of "hospitals in the area to which it seeks redesignation." 42 C.F.R. § 412.230(e)(1)(iv)(C). Reclassifications for the years relevant here used the average hourly wage for the preceding year. § 412.230(e)(2)(i). Thus, reclassifications for FFY 2002 were based on the average hourly wage data for FFY 2001.

In making a reclassification determination, the Secretary has ruled that "hospitals must use the wage survey data for a labor market area absent any reclassifications granted

_____

[1]    This represents a change from the prior system which provided for annual reclassifications. 42 U.S.C. § 1395ww(d)(10)(C)(i) (1992) (amended 2000).

6

by the MGCRB." Medicare Geographic Classification Review Board - Procedures and Criteria, 56 Fed. Reg. 25,458, 25,477 (June 4, 1991) (to be codified at 42 C.F.R. pt. 412). In other words, when a hospital is trying to determine if its average hourly wage equals at least 84% of that of the area to which it seeks reclassification, it must compare itself to the wage data of those hospitals physically located within the geographic area to which it seeks reclassification exclusive of any hospitals that have been reclassified to that area. This policy is known as the "reclassification exclusion" or "exclusion" policy. Among other things, this policy serves to prevent the applicant hospital comparing its average hourly wage to wage data that includes its own data from a previous year in which it reclassified to that area. This policy is discussed in greater detail below. See infra Part III.B.

The reclassification process, of necessity, occurs on a tight timeline. Hospitals were required to submit their applications for reclassification for FFY 2002 to the MGCRB by September 1, 2000. 42 U.S.C. § 1395ww(d)(10)(C)(ii); 42 C.F.R. § 412.276. The MGCRB then had until February 28, 2001 to render decisions on all FFY 2002 applications. 42 U.S.C. § 1395ww(d)(10)(C)(iii)(I). If an applicant hospital was dissatisfied with the decision, it could seek review of the decision by the Secretary's delegate, the Administrator of the Health Care Financing Administration (HCFA),[2] whose decision was required within ninety days of the filing of the appeal. §

---

[2]    In 2001, HCFA was renamed the Centers for Medicare and Medicaid Services. 42 C.F.R. § 400.200. We use the prior name because it was in effect during the events relevant to this appeal.

1395ww(d)(10)(C)(iii)(II).  The decision of the Secretary on an application for

reclassification is final and is not subject to judicial review.  Id.

D.  The Balanced Budget Refinement Act of 1999

The Hospital's position in this matter is based on section 152(b) of the Medicare,

Medicaid, and SCHIP Balanced Budget Refinement Act (BBRA) of 1999, Pub. L. No. 106-

113 Appendix F, 113 Stat. 1501A-321, 334-35 (1999).  In section 152(a) and (b),

Congress deemed certain specified geographic areas to be part of different wage areas for

Medicare payment purposes in FFYs 2000 and 2001 respectively.  The statute reads, in

pertinent part:

> **SEC. 152.  RECLASSIFICATION OF CERTAIN COUNTIES AND AREAS FOR PURPOSES OF REIMBURSEMENT UNDER THE MEDICARE PROGRAM.**
>
> . . . . .
>
> (b) FISCAL YEAR 2001.–Notwithstanding any other provision of law, effective for discharges occurring during fiscal year 2001, for purposes of making payments under section 1886(d) of the Social Security Act (42 U.S.C. 1395ww(d))--
>
>> (1) Iredell County, North Carolina is deemed to be located in the Charlotte-Gastonia-Rock Hill, North Carolina-South Carolina Metropolitan Statistical Area;
>>
>> (2) the large urban area of New York, New York is deemed to include Orange County, New York;
>>
>> (3) Lake County, Indiana, and Lee County, Illinois, are deemed to be located in the Chicago, Illinois Metropolitan Statistical Area;
>>
>> (4) Hamilton-Middletown, Ohio, is deemed to be located in the Cincinnati, Ohio-Kentucky-Indiana Metropolitan Statistical Area;
>>
>> (5) Brazoria County, Texas, is deemed to be located in the Houston, Texas Metropolitan Statistical Area; and
>>
>> (6) Chittenden County, Vermont is deemed to be located in the Boston-Worcester-Lawrence-Lowell-Brockton, Massachusetts-New Hampshire Metropolitan Statistical Area.

For purposes of that section, any reclassification under this subsection shall be treated as a decision of the Medicare Geographic Classification Review Board under paragraph (10) of that section.

§ 152, 113 Stat. at 1501A-334 to -335.

Section 152(a) effected a similar change for the same counties for FFY 2000.[3] The language of section 152(a) is almost identical to that of section 152(b) except the numbered sections in section 152(a) begin with the words "to hospitals in," authorizing direct payments, and it does not include a final sentence such as that at the conclusion of

---

[3] Section 152(a) provides:

(a) FISCAL YEAR 2000.--Notwithstanding any other provision of law, effective for discharges occurring during fiscal year 2000, for purposes of making payments under section 1886(d) of the Social Security Act (42 U.S.C. 1395ww(d))--

(1) to hospitals in Iredell County, North Carolina, such county is deemed to be located in the Charlotte-Gastonia-Rock Hill, North Carolina-South Carolina Metropolitan Statistical Area;

(2) to hospitals in Orange County, New York, the large urban area of New York, New York is deemed to include such county;

(3) to hospitals in Lake County, Indiana, and to hospitals in Lee County, Illinois, such counties are deemed to be located in the Chicago, Illinois Metropolitan Statistical Area;

(4) to hospitals in Hamilton-Middletown, Ohio, Hamilton-Middletown, Ohio, is deemed to be located in the Cincinnati, Ohio-Kentucky-Indiana Metropolitan Statistical Area;

(5) to hospitals in Brazoria County, Texas, such county is deemed to be located in the Houston, Texas Metropolitan Statistical Area; and

(6) to hospitals in Chittenden County, Vermont, such county is deemed to be located in the Boston-Worcester-Lawrence-Lowell-Brockton, Massachusetts-New Hampshire Metropolitan Statistical Area.

section 152(b).  113 Stat. at 1501A-334.

E.  Robert Wood Johnson University Hospital

The Hospital is a non-profit academic health center that participates in Medicare and is located in New Brunswick, New Jersey.  The Hospital receives payments for the services it performs on Medicare beneficiaries through the PPS and is physically located in the Middlesex-Somerset-Hunterdon, New Jersey MSA.  The Hospital is one of only two academic health centers in New Jersey performing complex and sophisticated services, including heart and lung transplants, open-heart surgery, and treatment for cancer, sickle cell, hemophilia, cystic fibrosis, and many other conditions.

Having qualified in previous years for reclassification to the New York City MSA, the Hospital sought reclassification again for FFY 2002.  As a hospital that is located only twelve miles from New York City and that provides complex medical services, the Hospital claims that it is forced to compete with hospitals in the New York City MSA for employees and, as a result, incurs much higher labor costs than the other hospitals in the Middlesex MSA.

On August 1, 2000, the Secretary published the final rule setting forth the average hourly wages for hospitals in all areas of the country for FFY 2001.  65 Fed. Reg. at 47,157-59 (listing average hourly wages for urban areas in Table 4D).  In calculating the average hourly wage for the New York City MSA, the Secretary did not include the wage data for Orange County hospitals because the Secretary deemed section 152(b)(2) of the BBRA to have effected a reclassification of the Orange County hospitals pursuant to the

usual reclassification rules. He therefore applied his policy of excluding reclassified hospitals from the calculation of the average hourly wage of the New York City MSA to which the Orange County hospitals were reclassified. Id. at 47,076-77.

On August 25, 2000, the Hospital used this data to file applications with the MGCRB for reclassification to the New York City MSA or, in the alternative, to the Monmouth-Ocean, New Jersey MSA. Reclassification to the New York City MSA for FFY 2002 would have provided the Hospital with reimbursement of $18 million more than it would have received if not reclassified, whereas reclassification to the Monmouth MSA provided it with only an additional $4 million. The Hospital knew at the time of its application that it was short of the requisite 84% for reclassification to the New York City MSA based on the published wage data for the New York City MSA. Br. of Appellant at 30. The Hospital's average hourly wage was 83.7766% of the average hourly wage for the New York City MSA. Br. of Appellant at 30.

On February 8, 2001, the MGCRB denied the Hospital's request to reclassify to the New York City MSA for failure to satisfy the 84% test, but granted its application to reclassify to the Monmouth MSA. On February 23, 2001, the Hospital requested that the HCFA Administrator review the MGCRB's denial of the Hospital's application to reclassify to the New York City MSA. Addendum to Br. of Appellant at 3-9. In a letter dated May 22, 2001, the Administrator affirmed the MGCRB's decision.

Although reclassification decisions are not subject to judicial review, the Secretary's average hourly wage determinations are subject to administrative and judicial

11

review if a hospital filed an appeal with the Provider Reimbursement Review Board

(PRRB). 42 U.S.C. § 1395*oo*(a). On December 8, 2000, before the MGCRB had denied

the Hospital's application, the Hospital filed such an appeal. The Hospital, anticipating the

denial, challenged the Secretary's calculation of the average hourly wage for the New York

City MSA because it excluded the Orange County hospitals' wage data. The Hospital

argued that the reclassification exclusion policy should not have been applied to the Orange

County hospitals. Had the Orange County hospitals' wage data been included in the

calculation of the average hourly wage for New York City, the average hourly wage of New

York City would have been lowered because the Orange County hospitals pay a lower wage.

This lower average hourly wage would have allowed the Hospital to meet the 84%

requirement for reclassification. On April 4, 2001, the PRRB responded that it was

"without authority to decide the legal question" and granted expedited judicial review to the

Hospital, giving it sixty days to seek judicial review. App. at 41.

On April 20, 2001, the Hospital commenced this action in the United States District

Court for the District of New Jersey seeking, inter alia, an order requiring the Secretary to

decide the Hospital's reclassification application based on a recalculation of the average

hourly wage for the New York City MSA that included the wage data from the Orange

County hospitals. Both parties moved for summary judgment. By an oral opinion and order

issued May 17, 2001, just a few days prior to the decision of the HCFA Administrator on

the reclassification appeal, the District Court granted summary judgment to the Secretary

and denied the Hospital's motion for summary judgment, finding that the Secretary's

12

interpretation was reasonable.

The Hospital presents two arguments on appeal. First, it argues that the BBRA did not <u>reclassify</u> the Orange County hospitals into the New York City MSA but actually <u>redefined</u> the physical boundaries of the New York City wage area to expand and include Orange County (and hence its hospitals). It bases this argument on the difference in section 152(b) of the BBRA between the language concerning New York City and Orange County and that concerning other areas. Under this argument, the reclassification exclusion policy would not apply and the New York City MSA would include the average hourly wage of the Orange County hospitals. The Hospital's second, and alternative argument, is that if section 152(b)(2) did effect a reclassification, the Secretary erred in incorporating his "reclassification exclusion" policy into that reclassification made pursuant to the BBRA.

## II.

## JURISDICTION AND STANDARD OF REVIEW

A. <u>Jurisdiction</u>

The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1395*oo*(f)(1). Section 1395*oo*(f) provides for judicial review of decisions of the PRRB. <u>See also</u> <u>Tallahassee Mem. Reg'l Med. Ctr. v. Bowen</u>, 815 F.2d 1435, 1449 n.27 (11th Cir. 1987); <u>Hosp. Ass'n of R. I. v. Sec'y of Health & Human Servs.</u>, 820 F.2d 533, 537 (1st Cir. 1987). This court has jurisdiction to review the final decision of the District Court pursuant to 28 U.S.C. § 1291.

Neither court has jurisdiction over the final decision of the MGCRB or the HCFA

13

Administrator denying the Hospital's application for reclassification. 42 U.S.C. § 1395ww(d)(10)(C)(iii)(II). Our review is limited to the issue before the PRRB regarding the Secretary's interpretation of the BBRA.

B. Standard of Review

This court's standard of review of the Hospital's challenge is governed by the Administrative Procedure Act, 5 U.S.C. § 706 (2001). That act allows this court to "hold unlawful or set aside agency action, findings, and conclusions" that are found to be, inter alia, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . [or] unsupported by substantial evidence." § 706(2).

The arbitrary and capricious standard, the standard relevant here, asks whether "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

The parties dispute the level of deference we must give the agency's action. The Secretary argues that we must follow the rule articulated in Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). Under Chevron, we must first determine if Congress has spoken directly to the question at issue. If Congress' intent is clear, our inquiry must end and we "must give effect to the unambiguously expressed intent of Congress." Id. at 843. If we decide Congress has not directly spoken to the issue

14

and that "the statute is silent or ambiguous with respect to the specific issue," we must ask whether the agency's interpretation is based on a "permissible construction of the statute." Id. If we find it is, we give deference to that interpretation. If Congress "explicitly left a gap for an agency to fill . . . a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Id. at 843-44.

The Hospital argues that the Supreme Court's decision in United States v. Mead Corp., 533 U.S. 218 (2001), requires that we be "indifferent" to the Secretary's interpretation. In Mead, the Court summarized the spectrum of judicial views as to the deference owed an agency's interpretation of its own statute, varying from "great respect," 533 U.S. at 228 (citing Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist., 467 U.S. 380, 389-90 (1984)), to "near indifference . . . to an interpretation advanced for the first time in a litigation brief," id. (citing Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212-13 (1988)). The Court in Mead stated that Chevron deference applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Id. at 226-27. The Mead Court refused to apply Chevron deference because it was clear that Congress did not intend to delegate authority to the United States Customs Service to issue rulings with the force of law. Id. The Court noted that "[d]elegation of authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a

15

comparable congressional intent." Id. at 227.  Similarly, in Bowen the Court held that little

deference was owed to the Secretary's position as it was unsupported by agency practice.

488 U.S. at 212-13.

Unlike Mead, in the case before us there is adequate indication of congressional

intent in the statute to demonstrate substantial delegation of authority to the Secretary,

including authority to promulgate guidelines for the reclassification process.  Unlike

Bowen, support for the arguments forwarded by the Secretary does not appear for the first

time in these litigation papers but is rooted in regulations and administrative practice.  The

Secretary explained his treatment of section 152(b) in the Federal Register, Changes to the

Hospital Inpatient Prospective Payment Systems and Fiscal Year 2001 Rates, 65 Fed. Reg.

47,054, 47,076 (Aug. 1, 2000) (to be codified at 42 C.F.R. pts. 410, 412, 413 & 485),

where he stated that "[f]or payment purposes, these hospitals [in areas listed in section

152(b)] are to be treated as though they were reclassified for purposes of both the

standardized amount and the wage index."  Id. at 47,076.  The Secretary further explained:

> Section 152(b) also requires that these reclassifications be treated for FY
> 2001 as though they are reclassification decisions by the MGCRB.
> Therefore . . . we proposed that the wage indexes for the areas to which these
> hospitals are reclassifying, as well as the wage indexes for the areas in which
> they are located, would be subject to all of the normal rules for calculating
> wage indexes for hospitals affected by reclassification decisions by the
> MGCRB.

Id.

Even were the Secretary's interpretation advanced for the first time in a legal brief,

it would not be without force.  The Supreme Court has stated that presentation of an

16

administrative interpretation "in the form of a legal brief" does not "make it unworthy of deference" in certain circumstances. Auer v. Robbins, 519 U.S. 452, 462 (1997) (finding that Secretary's interpretation was not a "post hoc rationalization" and that it represented the agency's "fair and considered judgment") (quotation and brackets omitted).

The broad deference of Chevron is even more appropriate in cases that involve a "complex and highly technical regulatory program," such as Medicare, which "require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)); see also Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1229 (D.C. Cir. 1994) (giving heightened deference due to "tremendous complexity of the Medicare statute" to Secretary's policy refusing to give retroactive effect to a revised wage index). In Sacred Heart Medical Center v. Sullivan, 958 F.2d 537 (3d Cir. 1992), we held that we must defer to the Secretary's construction of the Medicare statute in a dispute over the calculation of a hospital's target amount for inpatient operating costs under the PPS. Id. at 543-44 & n.11.[4] See also Barnhart v. Walton, 122 S. Ct. 1265, 1270-72 (2002) (sustaining the Secretary's interpretation of provision of Social Security Act). Similarly, in this case we hold Chevron deference should be applied to the Secretary's exclusion policy and its application.

---

[4]    We do not suggest that the same level of deference is applicable to all disputes with regard to Medicare. See, e.g., Mem'l, Inc. v. Harris, 655 F.2d 905, 912 (9th Cir. 1980) (noting that if the dispute itself is not "demanding of medical or Medicare program expertise," no significant deference is required).

**III.**

**DISCUSSION**

The threshold determination we must make is whether the Secretary's conclusion that section 152(b) of the BBRA served to "reclassify" the Orange County hospitals into the New York City MSA for wage index purposes was reasonable, or whether section 152(b) actually expanded the boundaries of the New York City MSA to include Orange County. If it was a reclassification, we continue the inquiry to determine whether or not the Secretary's application of the reclassification exclusion policy to the Orange County hospitals was arbitrary and capricious.

A. Reclassification or Redefinition of Boundaries?

The Hospital argues that the Secretary erred in interpreting the language of section 152(b) of the BBRA as reclassifying the Orange County hospitals, just as if it were effecting a standard reclassification. Instead, the Hospital reads the same language as expanding the borders of the New York City wage area to include Orange County.

At first glance this seems like an exercise in semantics – reclassification versus redefinition – but it has significant implications. A reclassification implicates a number of subsidiary regulations, such as the reclassification exclusion policy that the Secretary applied here. To redefine the New York City urban area to include Orange County would expand the borders of the New York City MSA to absorb Orange County for purposes of Medicare reimbursement. If it were treated as a part of the New York City MSA, the reclassification rules would not apply. Moreover, the inclusion of the average hourly wage

18

of the Orange County hospitals, as per the Hospital's interpretation, would dilute the average hourly wage for New York City so that the Hospital would satisfy the 84% threshold for reclassification.

The Hospital argues that this reading is required by the plain language of section 152(b). We must begin our review of a statute with the text. See Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992). The text provides some basis for the Hospital's argument. First, the provision regarding Orange County and New York City is worded differently from the provisions regarding the other five geographic areas referred to in section 152(b), which contain wording identical to each other. The other five provisions are worded "X is deemed to be located in the Y Metropolitan Statistical Area," whereas the provision in dispute reads "the large urban area of New York, New York is deemed to include Orange County, New York." 113 Stat. at 1501A-335. This difference is notable because Congress could have followed form when writing the Orange County provision and written "Orange County, New York is deemed to be located in the New York City Metropolitan Statistical Area." Instead, the provision on New York City is noticeably different from the rest.

Section 152(b) also refers to New York City as a "large urban area," not as an MSA as in the other provisions. The Hospital argues that the failure to refer to New York as an MSA in this section was deliberate because once the Orange County hospitals were included, the New York City wage area would no longer match the definition of the New York City MSA created by the United States Office of Management and Budget.

19

Second, the concluding sentence of section 152(b) states: "For purposes of that section, any reclassification under this subsection shall be treated . . . ." 113 Stat. at 1501A-335 (emphasis added). The Hospital argues that the use of the word "any" implies that not all of the actions under that subsection are reclassifications. It contends that if all six provisions effected reclassifications, there would have been no reason to use "any" as opposed to "all" reclassifications. The Hospital's argument is seemingly plausible, but the Hospital concedes there is no legislative history in support of its interpretation.

In response to the Hospital's statutory argument, the Secretary states that there is no substantive difference in the wording of the provisions. He argues that Congress would have been more explicit had it intended to implement the action that the Hospital suggests, and it would not have differentiated the Orange County provision in such an obscure manner. Moreover, the Secretary notes that the title of section 152 is "Reclassification of Certain Counties and Areas for Purposes of Reimbursement under the Medicare Program." 113 Stat. at 1501A-334 (emphasis added). This suggests that each provision within section 152 refers to a "reclassification." The District Court agreed with the Secretary and found "no merit" to the Hospital's construction of the statute, stating: "Congress certainly was at liberty, if it wished, to explicitly or even more implicitly determine what [the Hospital] argues. But to try to hang one's argument on 'deemed to include' instead of 'deemed to be located,' I think misses the point of giving expression to what has been articulated by Congress." App. at 5.

"When [a] 'statute's language is plain, the sole function for the courts' – at least

where the disposition required by the text is not absurd – 'is to enforce it according to its terms.'" Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 520 U.S. 1, 6 (2000) (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (quotation omitted)). Because we conclude that the text of the statute does not clearly address the appropriate treatment of Orange County, we need to look at the Secretary's interpretation of the statute to determine if his interpretation is a permissible construction of the statute. We must give deference to his interpretation of a statute that he is charged with administering unless that interpretation is contrary to the plain language of the statute, Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994), or to congressional intent as manifested in the legislative history, Pauley v. Beth Energy Mines, Inc., 501 U.S. 680, 696-98 (1991). Even where the agency's views are expressed informally, those views deserve deference where the agency has authority to administer the statute. Cleary ex rel. Cleary v. Waldman, 167 F.3d 801, 807-08 (3d Cir. 1999) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

The interpretation offered by the Secretary does not contradict the plain language of the statute nor, as noted above, is there any legislative history to the contrary. Because section 152(b) is part of a section entitled "reclassifications," refers to 42 U.S.C. § 1395ww(d)(10), the provision of the Medicare Act governing reclassifications, and refers to Orange County in language that is not markedly inconsistent with that used in the other provisions that plainly effected reclassifications, we must defer to the Secretary's position that section 152(b) legislated the reclassification of Orange County into the New York City

21

MSA.

Having reached this conclusion, we still need to examine whether it was arbitrary or capricious for the Secretary to apply the "reclassification exclusion" policy to the Orange County hospitals.

B.  Application of the Reclassification Exclusion Policy

As the Secretary argues, his exclusion of the Orange County hospitals from the New York City MSA for purposes of calculating the average hourly wage in that area was pursuant to his normal rules for reclassification.  65 Fed. Reg. at 47,076.  Having interpreted section 152(b) as reclassifying the Orange County hospitals into the New York City MSA for wage index purposes, the Secretary read the last sentence of section 152(b) to require application of the same rules that apply to reclassifications resulting from applications by hospitals.  Id.; Br. of Appellee at 29.  A reviewing court may not substitute its reasoned judgment for the agency's judgment under the narrow arbitrary and capricious standard applicable here.  Motor Vehicles, 463 U.S. at 43.

The last sentence of section 152(b) reads: "For purposes of that section [referring to 42 U.S.C. § 1395ww(d), which governs the PPS and reclassification], any reclassification under this subsection shall be treated as a decision of the Medicare Geographic Classification Review Board under paragraph (10) of that section."  113 Stat. at 1501A-335.  Paragraph 10, the statutory provision referenced in section 152(b), charges the Secretary with setting out the guidelines to be used by the MGCRB for reclassification.  § 1395ww(d)(10)(D).

22

The Secretary reads the final sentence of section 152(b) to make his pre-existing reclassification rules applicable to the section 152(b) reclassifications. Because these reclassifications are to be "treated as" ones made by the MGCRB, it was reasonable for the Secretary to treat them as such in all respects, including the application of otherwise applicable rules, such as the reclassification exclusion policy.

There are rational policy reasons for this treatment. The reclassification exclusion policy, which was published in the Federal Register, is an interpretation of the reclassification regulation whereby hospitals seeking reclassification must demonstrate that their average hourly wage is at least 84% of the average hourly wage of the "hospitals in the area to which it seeks redesignation." 42 C.F.R. § 412.230(e)(iv)(C). The Secretary's interpretation ensures that the practice of reclassification does not create anomalous results. Reclassifications are effective only for a limited time. Inclusion of the wage data of reclassified hospitals in determining whether one of those hospitals qualifies for reclassification in a subsequent year compares that hospital's data in part to its own wage data, an anomalous result. See Medicare Geographic Classification Review Board - Procedures and Criteria, 56 Fed. Reg. 25,458, 25,477 (June 4, 1991) (to be codified at 42 C.F.R. pt. 412) (providing various justifications for this policy, including the possibility that a wage area would contain no hospitals because all of its hospitals reclassified to other areas).

It is evident that Congress intended to benefit a limited number of identifiable hospitals by its enactment of section 152. As the Secretary has explained, "the

23

reclassifications enacted by section 152(b) pertain only to the hospitals located in the specified counties, not to hospitals in other counties within the MSA or hospitals reclassified into the MSA by the MGCRB." 65 Fed. Reg. 47,054, 47,076. This is consistent with the purpose of reclassification, which is to provide comparable reimbursement to hospitals that compete for the same labor pool due to their geographic proximity. It follows that it is reasonable to have a policy that ensures that a hospital is compared only to those geographically proximate hospitals, rather than to hospitals that have been reclassified to that area but do not compete for the same labor pool as the applying hospital. Significantly, the Hospital does not compete with the Orange County hospitals although both compete with the New York City hospitals.[5]

The Hospital replies that the last sentence of section 152(b) was inserted by Congress to trigger payment to the reclassified hospitals, not for the purpose of allowing the Secretary to apply normal rules of reclassification. However, it has not shown why this sentence would be necessary to trigger payments in light of the opening phrase of section 152(b), stating that the provision is for "purposes of making payments." 113 Stat. at 1501A-335. Neither has the Hospital adequately explained why the final sentence in section 152(b) is not also in section 152(a). The Secretary explains that the BBRA was enacted during FFY 2000, and therefore the PPS rates for that year had already been fixed.

---

[5] Indeed, as the Secretary's counsel noted at oral argument, if Orange County's average hourly wage were included in the New York figures, it "would result in New York hospitals getting less reimbursement." Tr. of Oral Argument at 28.

24

Because it was too late to incorporate the reclassifications of section 152(a) into the calculation of the FFY 2000 PPS rates, section 152(a) provides for payments directly "to hospitals" in the listed counties, eliminating the need to refer to the MGCRB. Id. at 1501A-334. Because FFY 2001, to which section 152(b) applies, had not begun, there was time to incorporate these reclassifications into the FFY 2001 PPS rates. The Secretary's explanation of the reference to the MGCRB in section 152(b) but not section 152(a) is reasonable and does not evidence the inconsistency argued by the Hospital.

The Hospital also contends that the Secretary's interpretation of the final sentence of section 152(b) as permitting him to apply the exclusion policy is inconsistent with the plain language of section 152(b) because the final sentence refers only to 42 U.S.C. § 1395ww(d)(10), which does not contain the reclassification exclusion policy. Although (d)(10) does not contain the exclusion policy, (d)(10) is the provision of the Medicare Act that establishes the MGCRB and authorizes the Secretary to generate the guidelines that are to govern reclassification by the MGCRB. Pursuant to that authority, the Secretary promulgated the reclassification exclusion policy. Therefore, application of that policy is not inconsistent with section 152(b), which states that the reclassifications effected by that section should be implemented pursuant to (d)(10).

The Hospital further argues that the phrase "notwithstanding any other provision of the law," 113 Stat. at 1501A-335, at the beginning of section 152(b) bars the Secretary from applying the reclassification exclusion policy. The Secretary explains that phrase was necessary to effect payment to these hospitals because they would not otherwise satisfy the

25

criteria for reclassification under the standing law. The Secretary's explanation of that phrase is reasonable.

The Hospital's arguments demonstrate that the statute is ambiguous, but they do not show that the Secretary's interpretation is impermissible or unreasonable. Thus, we conclude that the Secretary's interpretation is not arbitrary or capricious and must be upheld.[6]

## IV.

## CONCLUSION

For the above reasons, we will affirm the decision of the District Court denying the Hospital's motion for summary judgment and granting summary judgment for the Secretary.

---

[6] Even were we to find for the Hospital, it is not clear that we could grant the requested relief. In light of the budget neutrality provision of the Medicare statute, we could arguably only remand this issue to the Secretary, as any other action might result in our overturning an unreviewable decision of the Secretary. At a minimum, we would only be able to award prospective relief because changing the Hospital's payments for previous years would disrupt the budget neutrality requirement. "Budget neutrality can only be maintained if the Secretary's reclassification decisions are not subject to later change or modification." Skagit County Pub. Hosp. Dist. No. 2 v. Shalala, 80 F.3d 379, 386-87 (9th Cir. 1996) (finding no judicial review when the hospital "seeks review of the wage correction process only to achieve reversal of the reclassification decision"). See also Jordan Hosp. Inc. v. Shalala, 276 F.3d 72, 77 (1st Cir. 2002) (refusing to review a dismissal of an application for redesignation because of the need to publish final rates in a timely manner for planning purposes).