**PEABODY COAL CO., LLC, and Eastern Associated Coal Corp., Plaintiffs,**

v.

**Jo Anne B. BARNHART, Defendant,**

and

**Trustees of the United Mine Workers of America Combined Benefit Fund, Intervenor Defendant.**

**No. CIV 05–671–SLR.**

United States District Court, D. Delaware.

Jan. 11, 2007.

Morris, Nichols, Arsht & Tunnell, Wilmington, DE (Jason A. Cincilla, of counsel), John R. Woodham, W. Gregory Mott, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Washington, D.C., for plaintiffs.

United States Attorney's Office, Wilmington, DE (Patricia C. Hannigan, of counsel), Eric R. Womack, Esquire, United States Department of Justice, Washington, D.C., for defendant.

Ashby & Geddes, Wilmington, DE (Carolyn Shelly Hake, of counsel), Christopher F. Clarke, Office of the General Counsel, UMWA Health & Retirement Funds, Washington, D.C., for intervenor defendant.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

### I. INTRODUCTION

On September 14, 2005, Peabody Coal Company, LLC ("Peabody") and Eastern Associated Coal Corporation ("EACC") (collectively, "plaintiffs") filed suit against defendant Jo Anne B. Barnhart ("Barnhart"), the Commissioner of the Social Security Administration ("SSA"). (D.I.1) Plaintiffs' complaint alleges that Barnhart's decision [1] to assign them responsibil-

---

1. The decision currently being challenged by plaintiffs was actually made by Kenneth S.

ity for funding health and death benefits for certain retired coal industry employees violated both § 9706 of the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§ 9701 *et seq.*, and §§ 702 and 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706. (D.I.1, *passim* ) On March 10, 2006, the Trustees of the United Mine Workers of America Combined Benefit Fund ("Trustees") filed an unopposed motion to join the instant litigation as an intervenor defendant (D.I.6), which the court granted.

Presently before the court are defendant Barnhart's motion to dismiss the complaint for failure to state a claim (D.I.9), and defendant Trustees' and plaintiffs' respective motions for summary judgment. (D.I.13, 15) The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331; 5 U.S.C. §§ 701 *et seq.;* 28 U.S.C. § 2201; and 26 U.S.C. § 9721. Venue is proper under 28 U.S.C. § 1391(e).

## II. BACKGROUND [2]

### A. History of Benefits Plans for American Coal Workers [3]

"For a good part of this century, employers in the coal industry have been involved in negotiations with the United Mine Workers of America [ ('UMWA') ] regarding the provision of employee benefits to coal miners." *Eastern Enters. v. Apfel,* 524 U.S. 498, 504, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality opinion). In 1946, after almost a decade of lobbying by the UMWA which culminated in a nation-

wide strike by mine workers, the federal government intervened in the coal industry. *Id.* at 504–05, 118 S.Ct. 2131. The resulting Krug–Lewis Agreement of 1946 "led to the creation of benefit funds [for mine workers], financed by royalties on coal produced and payroll deductions. The funds compensated miners and their dependents and survivors for wages lost due to disability, death, or retirement .... [and] provided for the medical expenses of miners and their dependents ...." *Id.* at 505, 118 S.Ct. 2131.

Soon thereafter, "the UMWA and several coal operators entered into the National Bituminous Coal Wage Agreement of 1947 [ ('1947 Agreement') ], which established the United Mine Workers of America Welfare and Retirement Fund" ("1947 Fund"). *Id.* Due to disagreements over which kinds of benefits were owed to miners under the 1947 Agreement, "a new multiemployer trust [called] the United Mine Workers of America Welfare and Retirement Fund of 1950" ("1950 Fund") was established. *Id.* at 506.

As with the 1947[ ] Fund, the 1950[ ] Fund was governed by three trustees chosen by the parties and vested with responsibility to determine the level of benefits.... Between 1950 and 1974, the 1950 [Agreement] was amended on occasion, and new [agreements] were adopted in 1968 and 1971. Except for the increases in the amount of royalty payments, however, the terms and structure of the 1950[ ] Fund remained essentially unchanged.

Apfel, who served as Commissioner of the SSA from September 29, 1997 to January 20, 2001. The SSA, however, under the direction of defendant Barnhart, continues to enforce and defend Apfel's policy; consequently, for the purposes of this opinion, the court will attribute the reassignments at issue in the case at bar to Commissioner Barnhart.

**2.** For an unabridged history of the Coal Act and its predecessors, see *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality opinion).

**3.** For brevity's sake, the court has omitted, in this subsection only, the internal citations used by the Supreme Court in its *Eastern* opinion.

*Id.* The 1950 Agreement established a "pay-as-you-go" system, and miners were not promised any specific benefits. *See id.* at 506–07. According to the Supreme Court, "it is clear that the 1950[ ] Fund did not, by its terms, guarantee lifetime health benefits for retirees and their dependents," *id.* at 508; in fact, "[s]ubsequent annual reports of the 1950[ ] Fund reiterated that benefits were subject to change," *id.* at 507.

The enactment of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, necessitated the abandonment of the 1950 Fund's "pay-as-you-go" process in favor of "specific funding and vesting requirements for pension plans." *Eastern,* 524 U.S. at 509, 118 S.Ct. 2131. Compliance with ERISA was achieved through creation of the National Bituminous Coal Wage Agreement of 1974 ("1974 Agreement"),

> which created four trusts, funded by royalties on coal production and premiums based on hours worked by miners, to replace the 1950[ ] Fund. Two of the new trusts, the UMWA 1950 Benefit Plan and Trust [ ("1950 Plan") ] and the UMWA 1974 Benefit Plan and Trust [ ("1974 Plan") ], provided nonpension benefits, including medical benefits. Miners who retired before January 1, 1976, and their dependents were covered by the 1950[ ] Plan, while active miners and those who retired after 1975 were covered by the 1974[ ] Plan.

> The 1974 [Agreement] thus was the first agreement between the UMWA and the [Bituminous Coal Operators' Association ("BCOA") ] to expressly reference health benefits for retirees; prior agreements did not specifically mention retirees, and the scope of their benefits

was left to the discretion of fund trustees. . . . Despite the expanded benefits, the 1974 [Agreement] did not alter the employers' obligation to contribute only a fixed amount of royalties, nor did it extend employers' liability beyond the life of the agreement.

*Id.*

The 1950 and 1974 Plans soon began running into funding problems, leading to the formation of yet another agreement ("1978 Agreement") which "assigned responsibility to signatory employers for the health care of their own active and retired employees. The 1974[ ] Plan remained in effect, but only to cover retirees whose former employers were no longer in business." [4] *Id.* at 510, 118 S.Ct. 2131. Furthermore,

> [t]o ensure the [ ] Plans' solvency, the 1978 [Agreement] included a "guarantee" clause obligating signatories to make sufficient contributions to maintain benefits during that agreement, and "evergreen" clauses were incorporated into the [ ] Plans so that signatories would be required to contribute as long as they remained in the coal business, regardless of whether they signed a subsequent agreement.

*Id.* Only at this point in time did "the coal operators' liability to the [ ] Plans shift[ ] from a defined contribution obligation, under which employers were responsible only for a predetermined amount of royalties, to a form of defined benefit obligation, under which employers were to fund specific benefits." *Id.* at 510–11, 118 S.Ct. 2131.

Even after implementing these changes in 1978, financial troubles continued to plague the Funds as costs rose and an

---

4. Under the Coal Act, "a person [is] considered to be in business if such person conducts or derives revenue from any business activity, whether or not in the coal industry." 26 U.S.C. § 9701(c)(7).

increasing number of signatories withdrew from the 1978 Agreement. *See id.* at 511, 118 S.Ct. 2131. "In 1988, the UMWA and BCOA attempted to relieve the situation by imposing withdrawal liability on ... signatories who seceded from the [ ] Plans." *Id.* The ameliorative measures employed by the 1988 Agreement failed to alleviate the 1950 and 1974 Plans' funding problems. *See id.*

In 1992, galvanized in part by concerns "that retired miners might not receive the benefits promised to them," *id.* at 513, 118 S.Ct. 2131, Congress passed the Coal Act, 26 U.S.C. §§ 9701 *et seq.,* which, as of February 1, 1993, "merged the 1950 and 1974[ ] Plans into a new[,] [private] multiemployer plan called the United Mine Workers of America Combined Benefit Fund ('Combined Fund')" and guaranteed that retirees and their dependents would continue to receive " 'substantially the same' " benefits as they had under the prior plans, *Eastern,* 524 U.S. at 514, 118 S.Ct. 2131; *see also* 26 U.S.C. § 9702(a)(1).

### B. The Coal Act

The Coal Act, which qualifies as an employee benefit plan under ERISA, *see* 26 U.S.C. § 9702(a)(3)(B), secures health and death benefits for (1) coal industry retirees "who, on July 20, 1992, [were] eligible to receive, and [were] receiving, benefits

from the [1950 Plan] or the [1974 Plan], or (2) on such date [were] eligible to receive, and [were] receiving, benefits in either such plan by reason of a relationship to such retiree," *id.* § 9703(f). Assigned operators (or "[a]ny related person with respect to such an assigned operator" [5]) were made liable for underwriting the Combined Fund through payment of annual premiums. *See id.* § 9704(a). The 1950 and 1974 Plans were charged with covering costs the Combined Fund had incurred before February 1, 1993. *See id.* § 9704(i)(3).

Section 9706 of the Coal Act set a deadline of October 1, 1993, by which date the Commissioner of the SSA was required

> [to] assign each coal industry retiree who [was] an eligible beneficiary to a signatory operator which (or any related person with respect to which) remain[ed] in business in the following order:
>
> (1) First, to a signatory operator which -
>
>> (A) was a signatory to the 1978 [Agreement] or any subsequent coal wage agreement and
>>
>> (B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

---

**5.** With regard to signatory operators ("a person which is or was a signatory to a coal wage agreement"), the Coal Act defines a "related person" as:

> (i) a member of the controlled group of corporations ... which includes such signatory operator;
>
> (ii) a trade or business which is under common control ... with such signatory operator; or
>
> (iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, ex-

cept that this clause shall not apply to a person whose only interest is as a limited partner.

A related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii).

26 U.S.C. §§ 9701(c)(1), (c)(2)(A). The relationships identified in the above clauses were to be "determined as of July 20, 1992, except that if, on July 20, 1992, a signatory operator [was] no longer in business, the relationships [would] be determined as of the time immediately before such operator ceased to be in business". *Id.* § 9701(c)(2)(B).

(2) Second, if the retiree [was] not assigned under paragraph (1), to the signatory operator which -

(A) was a signatory to the 1978 [Agreement] or any subsequent coal wage agreement and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

(3) Third, if the retiree [was] not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 [Agreement]. *Id.* § 9706(a).[6] Section 9706 also states, however, that "[e]mployment with (i) a person which is (and all related persons with respect to which are) no longer in business, or (ii) a person during a period during which such person was not a signatory to a coal wage agreement" would not be taken into account when making said assignments. *Id.* § 9706(b)(1)(B).

In the case of beneficiaries for whom no statutorily-defined signatory operators exist ("unassigned beneficiaries"), the Coal Act states that "[t]he unassigned beneficiaries premium for any plan year for any assigned operator shall be equal to the applicable percentage[7] of the product of the per beneficiary premium for the plan year multiplied by the number of eligible [unassigned] beneficiaries ...." *Id.* § 9704(d). Assigned operators' contributions to the Combined Fund are supplemented yearly by funds collected under § 1232(h) of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1232(h), a transfer intended "to proportionately reduce the unassigned beneficiary premium ... of each assigned operator." 26 U.S.C. § 9705(b).

### C. *Eastern Enterprises v. Apfel*

The petitioner in *Eastern*, a coal operator named Eastern Enterprises ("Eastern"), was founded in 1929. *See Eastern Enters. v. Apfel*, 524 U.S. 498, 504, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality opinion[8]). While engaged in the coal mining business, Eastern signed every Agreement enacted between 1947 and

---

6. Plaintiff Peabody Coal Co. has already challenged the Commissioner's statutory authority to make such assignments after the October 1, 1993 deadline set forth in § 9706 of the Coal Act. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003). The United States Supreme Court ruled in favor of the Commissioner:

> To accept the [coal] companies' argument that the specified date for action is jurisdictional would be to read the Act so as to allocate not the greatest, but the least, number of beneficiaries to a responsible operator. The way to reach the congressional objective [behind the Coal Act], however, is to read the statutory date as a spur to prompt action, not as a bar to tardy completion of the business of ensuring that benefits are funded, as much as possible, by those identified by Congress as principally responsible.

*Id.* at 172, 123 S.Ct. 748.

7. "The term 'applicable percentage' means, with respect to any assigned operator, the percentage determined by dividing the number of eligible beneficiaries assigned under section 9706 to all such operators (determined on the basis of assignments as of October 1, 1993)." 26 U.S.C. § 9704(f)(1). The Coal Act also contains a method for redetermining the applicable percentage for each assigned operator "[i]n the case of any plan year beginning on or after October 1, 1994." *Id.* § 9704(f)(2).

8. Chief Justice Rehnquist and Justices Thomas and Scalia joined Justice O'Connor's plurality opinion, which addressed only Eastern's Takings Clause argument. Justice Kennedy, whose decision was grounded in substantive due process principles, concurred in the judgment. *See Eastern*, 524 U.S. at 539–50, 118 S.Ct. 2131 (Kennedy, J., concurring in the judgment and dissenting in part).

1964, contributing over $60 million to the 1947 and 1950 Funds. *See id.* at 516, 118 S.Ct. 2131. In 1965, Eastern transferred its coal-related operations to EACC, one of its subsidiaries. This transfer "was described in Eastern's federal income tax return as an agreement by EACC to assume all of Eastern's liabilities arising out of coal mining and marketing operations in exchange for Eastern's receipt of EACC stock." *Id.* Eastern received over $100 million in dividends from its stock holdings in an EACC subsidiary between 1965 and 1987, when it sold this interest to Peabody. *See id.* "Under the terms of the agreement effecting the transfer, Peabody, CPC [ (the EACC subsidiary) ], and EACC assumed responsibility for payments to certain benefit plans, including the 'Benefit Plan for UMWA Represented Employees of EACC and Subs.'" *Id.*

After the Coal Act was enacted in 1992, "the Commissioner [of the SSA] assigned to Eastern the obligation for Combined Fund premiums respecting over 1,000 retired miners who had worked for the company before 1966, based on Eastern's status as the pre–1978 signatory operator for whom the miners had worked for the longest period of time." *Id.* at 517, 118 S.Ct. 2131 (citing 26 U.S.C. § 9706(a)). This assignment, if valid, would cost Eastern more than $5 million per year even though it had not signed any of the wage agreements enacted after the year 1964. In light of that fact, Eastern sued the Commissioner of the SSA, the Combined Fund, and the Combined Fund's trustees, "assert[ing] that the Coal Act, either on its face or as applied, violate[d] substantive due process and constitute[d] a taking of its property in violation of the Fifth Amendment. Eastern also challenged the Commissioner's interpretation of the Coal Act." *Id.* The United States District Court for the District of Massachusetts granted, and the Court of Appeals for the First

Circuit affirmed, summary judgment in the Commissioner's favor. *See id.* at 517–19, 118 S.Ct. 2131. The United States Supreme Court then granted a writ of certiorari.

The Court's analysis of the Coal Act in *Eastern* "[was] informed by [its] previous decisions considering the constitutionality of somewhat similar schemes." *Id.* at 524, 118 S.Ct. 2131. One such decision stated that " 'legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and ... the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way,' " although "stricter limits may apply to Congress' authority when legislation operates in a retroactive manner." *Id.* (omission in original) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 16–17, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). Upon review of these prior cases, Justice O'Connor, writing for the plurality, stated that "[o]ur opinions ... make clear that Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties. Congress also may impose retroactive liability to some degree, particularly where it is 'confined to short and limited periods required by the practicalities of producing national legislation.' " *Id.* at 528, 118 S.Ct. 2131 (quoting *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 731, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)). Justice O'Connor cautioned, however, that "[o]ur decisions ... have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportion-

ate to the parties' experience." *Id.* at 528–29, 118 S.Ct. 2131.

In determining that "the Coal Act's allocation scheme, as applied to Eastern, present[ed] such a case" of unconstitutional retroactive liability, the plurality "appl[ied] the three factors that traditionally have informed [the Court's] regulatory takings analysis," *id.* at 529, 118 S.Ct. 2131: "'[t]he economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action,'" *id.* at 523–24, 118 S.Ct. 2131 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)).[9] Ultimately, the plurality found that

> the nature of the governmental action in this case is quite unusual. That Congress sought a legislative remedy for what it perceived to be a grave problem in the funding of retired coal miners' health benefits is understandable .... When, however, that [legislative] solution singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused, the governmental action implicates fundamental principles of fairness underlying the Takings Clause. Eastern cannot be forced to bear the expense of lifetime health benefits for miners based on its activities decades before those benefits were promised. Accordingly, in the specific circumstances of this case, we conclude that the Coal Act's application to

Eastern effects an unconstitutional taking.

*Id.* at 537, 118 S.Ct. 2131. Because it had already "determined that the third tier of the Coal Act's allocation scheme violate[d] the Takings Clause as applied to Eastern," the plurality declined to address the petitioner's due process claim, nor did it "consider the first two tiers of the Act's allocation scheme, 26 U.S.C. §§ 9706(a)(1) and (2), as the liability that [had] been imposed on Eastern [arose] only under the third tier[,]" *id.* § 9706(a)(3). *Eastern*, 524 U.S. at 538, 118 S.Ct. 2131.

Justice Kennedy "disagree[ed] with the plurality's Takings Clause analysis" because he deemed it "incorrect and quite unnecessary for decision of the case"; despite this, he concurred in the plurality's judgment because he found, under a due process analysis, that the Coal Act was "arbitrary and beyond the legitimate authority of the government to enact." *Id.* at 539, 118 S.Ct. 2131 (Kennedy, J., concurring in the judgment and dissenting in part).

### D. Post-*Eastern* Developments [10]

After the *Eastern* decision was handed down in 1998, "the Commissioner voided [the] assignments she had previously made to Eastern Enterprises pursuant to section 9706(a)(3). Consistent with judicial retroactivity principles, she also voided assignments to other 'similarly situated' coal operators, *i.e.*, those who had not signed a 1974 or later [Agreement]" or were not a "related person" to such a signatory opera-

---

**9.** According to the plurality, "the process for evaluating a regulation's constitutionality involves an examination of the 'justice and fairness' of the governmental action." While such determination "is essentially ad hoc and fact intensive" and "does not lend itself to any set formula," the three above-listed factors "have particular significance." *Eastern*, 524

U.S. at 523, 118 S.Ct. 2131 (citations omitted).

**10.** While the facts and quotations in this subsection were taken from plaintiffs' opening brief, they are generally consistent with the "Statement of Facts" presented in the opening brief of each defendant.

tor. (D.I. 17 at 8–9) At first, the Commissioner reallocated those beneficiaries affected by the *Eastern* decision ("*Eastern* Beneficiaries") to the "unassigned" pool. In 1999, however, the SSA began reexamining the *Eastern* Beneficiaries' work histories in order to determine whether they could be reassigned to signatory operators other than Eastern in a manner consistent with both the three-tiered scheme set forth in § 9706 of the Coal Act and the Supreme Court's decision in *Eastern*. (*Id.* at 9) The Commissioner subsequently reassigned a large number of *Eastern* Beneficiaries to operators (including the plaintiffs in the case at bar) which had, unlike Eastern, signed a coal wage agreement in or after the year 1974. (*Id.* at 10)

Plaintiffs aver that, "in 1999, SSA assigned 83 UMWA retirees to Peabody and 9 UMWA retirees to EACC.... [U]nder the Coal Act each [plaintiff] is responsible for the premium obligations of the other." (D.I. 16 at ¶ 7) According to plaintiffs, these 92 assignees "collectively accounted for 122 individuals who were" alive as of February 1993 and whose benefits plaintiffs were responsible for funding. (*Id.* at ¶ 8) Plaintiffs calculate that, "through and including [Fiscal Year] 2006, [plaintiffs] have been assessed $2,433,806 in premiums by the Combined Fund with respect to the beneficiaries SSA assigned to them in 1999." (*Id.*)

The instant litigation questions the propriety of the Commissioner's decision to reassign as many "orphaned" *Eastern* Beneficiaries as possible to those signatory operators (or their related persons) who, after Eastern-type operators were removed from consideration, had the closest relationship to those Beneficiaries under the hierarchical scheme set forth in the Coal Act. Plaintiffs' complaint "demand[s]

judgment against the Commissioner and pray[s] for the following relief":

(1) an order "declaring that the Commissioner's policy of treating the statutorily designated signatory of *Eastern* Beneficiaries as constructively out of business is *ultra vires* [and] violates § 9706 of the Coal Act";

(2) an order vacating the Commissioner's assignment to plaintiffs of any *Eastern* Beneficiaries;

(3) an order "requiring the Commissioner to inform the UMWA Combined [ ] Fund that the *Eastern* Beneficiary assignments to [plaintiffs] are void *ab initio* and have been revoked";

(4) an order "enjoining the Commissioner from making any future assignments of *Eastern* Beneficiaries to [plaintiffs] or to any related person to [plaintiffs]"; and

(5) any additional relief that the court "deems equitable and just."

(D.I. 1 at 5–6)

In support of their position, plaintiffs argue that: (1) under the three-part scheme laid out in § 9706 of the Coal Act, Eastern and the other super reachback operators [11] are the proper assigned operators for the *Eastern* Beneficiaries; (2) the Supreme Court has held that super reachback operators cannot constitutionally be held accountable for funding the *Eastern* Beneficiaries' benefit plans; (3) "[u]nlike other federal statutes ... the Coal Act does not provide for 'next-in-line' or 'drop back' assignments"; (4) "Congress neither authorized nor directed the Commissioner to search for an alternate assignee" for the *Eastern* Beneficiaries; and (5) "the Coal Act clearly provides that where a beneficiary cannot be assigned to a particular operator under the specific assignment

---

11. Plaintiffs define "super reachback companies" as former employers of coal workers

"that did not sign a 1974 or later UMWA coal wage agreement." (D.I. 17 at 1 n. 1)

rules laid down in section 9706[,] he is allocated to the unassigned pool," not to an alternate assignee. (D.I. 17 at 2–4) According to plaintiffs, when the Court's decision in *Eastern* invalidated the way § 9706 had been applied to super reachback operators, the Commissioner was not subsequently free to pretend, for reassignment purposes, that those operators had never existed.[12] (*Id.* at 28) "For purposes of construing the assignment rules post-*Eastern*," plaintiffs contend, "the Commissioner cannot simply ignore section 9706(a)(3), which states that the only responsible operator for super reachback beneficiaries is the former employer who employed the miner longest." (*Id.* (emphasis added)) "Accordingly," plaintiffs state,

> allocating the [*Eastern* Beneficiaries] to the unassigned pool is not only required by the language of section 9706, it is also the only result consistent with the congressional goal of moderating the financial impact of the legislation on the 1978 and subsequent [Agreement] signatory companies. The Commissioner's unilateral decision to shift to [p]laintiffs the very financial burden that Congress determined should be assigned to pre–1978 signatories like Eastern Enterprises undercuts the compromise financing scheme Congress delineated in section 9706.

(*Id.* at 34)

Defendant Barnhart maintains that, after *Eastern*, "the Commissioner was forced to react to a decision of the Supreme Court declaring one express application of the statute unconstitutional. Because Congress did not predict such an

outcome[,] the only question for the Court is whether the Commissioner's action in light of *Eastern Enterprises* was consistent with the intent of Congress and the purpose of the Coal Act." (D.I. 19 at 4) Defendant Trustees likewise asserts that

> severability jurisprudence teaches that there is only one question that this court needs to answer to determine whether SSA properly assigned *Eastern* beneficiaries to Peabody. That question is whether Congress's intent is best served by assigning *Eastern* beneficiaries to coal operators such as Peabody for whom they worked (as SSA concluded and the Trustees contend), or by leaving those beneficiaries permanently unassigned and having their health care costs covered by transfers from [alternate sources, including] . . . coal operators who did not employ them.

(D.I. 14 at 11–12) According to Trustees, "the plain language of the Coal Act cannot resolve this issue"; therefore, it contends,

> this [c]ourt can take one of two alternative approaches. The first approach is for this [c]ourt to construe the Coal Act in the light of *Eastern* in the manner that will best effectuate the manifest purposes of Congress in enacting the Coal Act. The second approach is for this [c]ourt to conclude that such a task is more appropriately left to SSA, the agency charged with making assignments under the Coal Act.

(*Id.* at 12) Defendants also contend that the decision of the Commissioner, the head of the agency charged with administering

---

**12.** "Plaintiffs agree that the effect of retroactivity jurisprudence means the super reachback companies were never eligible to receive assignments, and that those assignments were invalid from the beginning. However, [they argue,] this provides no insight or guidance as

to what happens to those beneficiaries post-*Eastern*. That is a separate question which can be resolved only by examining the statutory provisions unaffected by the *Eastern* decision." (D.I. 17 at 28)

the Coal Act, is entitled to deference. (D.I. 10 at 16; D.I. 14 at 18)

Plaintiffs have filed a motion for summary judgment against both defendants (D.I.15), arguing that "[t]he Commissioner exceeded her authority when, in the wake of *Eastern,* she administratively allocated to [p]laintiffs the $2.4 million (to date) financial burden of providing health care benefits for 92 retirees that Congress directed be assigned to super reachback companies" (D.I. 17 at 4 ¶ 6). Defendant Barnhart filed a motion to dismiss plaintiffs' claims; this was followed by intervenor defendant Trustees' motion for summary judgment. (D.I.9, 13) Both defendants contend that the Commissioner's method for reassigning *Eastern* Beneficiaries was a valid reading of both congressional intent with respect to the Coal Act and the Supreme Court's holding in *Eastern.* (*See generally* D.I. 10, 14)

## III. STANDARD OF REVIEW

### A. Motion to Dismiss

In analyzing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The moving party has the burden of persuasion. *See Kehr Pack-*

*ages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

### B. Motion for Summary Judgment

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient

showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

### A. Persuasive Case Law

At present, six federal courts have upheld the power of the Commissioner of the SSA to make assignments such as the ones at issue in the case at bar.[13] The most recent such case was decided by the United States District Court for the Northern District of Alabama. *See U.S. Steel Corp. v. Barnhart,* No. CV–04–HS–0065–S, slip op. (N.D. Ala. June 20, 2006). The plaintiffs in *U.S. Steel*

claim[ed] that [the] SSA's actions [in reassigning the *Eastern* Beneficiaries] were not required by *Eastern Enterprises* and [were] in fact prohibited by the plain language of the Coal Act.... They cite[d] 26 U.S.C. § 9704(f)(2)(B) as authority for this contention. It states that if the company that a miner is originally assigned to goes out of business, the miner is not reassigned to another operator but is instead placed in the orphan pool. This essentially prohibits SSA from assigning miners to the "next-in-line" operator.

*Id.* at 21. The SSA, in turn, "argue[d] that § 9704(f)(2)(B) [was] irrelevant in this case because *Eastern Enterprises* applies retroactively, meaning that the initial, unconstitutional assignments 'do not count' and [the] plaintiffs [were] the first operators to which premium liability [had] been constitutionally assigned for" the *Eastern* Beneficiaries in question. *Id.* at 22. The Alabama court noted that, "[w]ith one exception that is no longer good law, every federal court that has addressed this issue has held that [the] SSA's actions represent a permissible construction of the [Coal Act] in light of the *Eastern Enterprises* decision," and that those same courts "[had] also recognized ... that [the] SSA's construction of the statute is in keeping with the congressional intent underlying the Coal Act." *Id.* at 22, 24 (footnote omitted). The court in *U.S. Steel,* therefore, found itself "loathe to go against the great weight of authority on this issue" and adjudged the Commissioner's post-*Eastern*

**13.** *See Sidney Coal Co., Inc. v. SSA,* 427 F.3d 336, 347 (6th Cir.2005) (reversing decision of the United States District Court for the Eastern District of Kentucky) ("By assigning each *Eastern* beneficiary to the operator to whom they should have been assigned in 1993 ..., the SSA applied the criteria in a manner that allowed the Act to 'function effectively and serve [its] purpose even after the invalid application has been excised.'" (alteration in original) (citation omitted)), *cert. denied,* — U.S. —, 126 S.Ct. 1608, 164 L.Ed.2d 301 (2006); *Elgin Nat'l Indus. v. Barnhart,* Nos. 04–5243 & 04–7094, 2005 U.S.App. LEXIS 7361 (D.C.Cir. Apr. 27, 2005) (upholding the Commissioner's reassignments for the reasons set forth in *Pittston Co. v. United States,* 368 F.3d 385, 401–05 (4th Cir.2004)); *Pittston,* 368 F.3d at 404 ("[I]n making reassignments, the Commissioner did not change the wording of the [Coal Act], but merely fol-

lowed the Supreme Court's ruling [in *Eastern*] that the Coal Act may only apply to a narrower group of persons than previously thought."), *cert. denied, Brink's Co. v. United States,* 544 U.S. 904, 125 S.Ct. 1589, 161 L.Ed.2d 276 (2005); *U.S. Steel Corp. v. Barnhart,* No. CV–04–HS–0065–S, slip op. (N.D. Ala. June 20, 2006) (discussed further in the body of this opinion); *Nell Jean Indus., Inc. v. Barnhart,* 224 F.Supp.2d 10, 26 (D.D.C.2002) ("[T]he Commissioner fulfilled her duty [of properly reassigning the *Eastern* Beneficiaries] by applying the assignment criteria in the Act as if the Eastern-type companies had never been available for assignment."); *Wheeling–Pittsburgh Steel Corp. v. Barnhart,* 229 F.Supp.2d 539, 554–55 (N.D.W.V.2002) ("[T]he Commissioner had the authority to reassign beneficiaries in response to the *Eastern Enterprises* [decision] and, thus, ... acted within the bounds of the law.").

reassignments "permissible as a matter of law." *Id.* at 24.

### B. Statutory Construction

■ Plaintiffs argue that "[t]here is no statutory difference between beneficiaries whose responsible employer [cannot] pay premiums because they are [now] defunct, and beneficiaries whose responsible employer [cannot] be compelled to pay premiums because the Judicial Branch [will not] enforce the premium obligation." (D.I. 20 at 16) Barnhart dismisses this argument because, in her opinion, it "ignores the fact that the [Eastern] assignments were void *ab initio*. When assigning the beneficiaries in the present case to the plaintiffs, the Commissioner was, according to standard principles of retroactivity, making an initial assignment." (D.I. 19 at 14) Therefore, Barnhart maintains, it was proper for the Commissioner to make the post-*Eastern* reassignments in question because she was merely "reinitiating the search through the [§ 9706(a)] hierarchy for an initial, accurate assignment." (*Id.* at 6)

[T]he Coal Act is not [a "next-in-line"] scheme because it provides for a single valid assignment. For each beneficiary here, however, that single valid assignment is to one of the plaintiffs. Although the beneficiaries were initially assigned to Eastern-like operators, those initial assignments were unconstitutional and therefore erroneous. The Commissioner corrected these erroneous assignments by voiding them *ab initio* and retroactively reassigning the beneficiaries to the correct assignees, namely plaintiffs. There is no "next in line" assignment, which would entail changing correct assignments over time.... [T]he assignments to plaintiffs are thus similar to the corrected assignments provided for in 26 U.S.C. § 9706(f) [14] ....

(*Id.* at 13–14 (emphasis in original) (internal citation omitted)) Defendant Trustees adopts Barnhart's position on this matter:

In holding in *Eastern* that it was unconstitutional to assign Combined Fund beneficiaries to Eastern Enterprises, the Supreme Court was not stating merely that from that point forward it would be unconstitutional to assign beneficiaries to Eastern Enterprises, but that it had never been constitutional to do so. Eastern-type operators were not suddenly removed from the Coal Act equation after the Supreme Court decided *Eastern;* they had never constitutionally been part of that equation and, therefore, were never eligible to receive assignments.

(D.I. 14 at 16)

According to the United States Supreme Court, if a statute

"is silent or ambiguous with respect to the specific issue [being addressed by an administrative agency]," [a court] must sustain the Agency's interpretation if it is "based on a permissible construction" of the [statute]. Hence [the court] must decide (1) whether the statute unambiguously forbids the Agency's interpretation, and, if not, (2) whether the interpretation, for other reasons, exceeds the bounds of the permissible.

*Barnhart v. Walton,* 535 U.S. 212, 218, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (internal citations omitted). *See also Barnhart v. Thomas,* 540 U.S. 20, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003) (reversing the Third Circuit's decision in *Thomas v. Comm'r of Soc. Security,* 294 F.3d 568 (3d Cir.2002), and finding the SSA's construction of the

---

14. "If the Commissioner of Social Security determines ... that an assignment was in error ... the Commissioner shall review the beneficiary's record for reassignment under" the § 9706(a) hierarchy. 26 U.S.C. § 9706(f)(3)(A).

Social Security Act in that case reasonable and entitled to deference). In its discussion of the issue presently before this court, the United States Court of Appeals for the Sixth Circuit opined that

the Coal Act contains no language as to how the SSA should have handled the precise question raised by the *Eastern Enterprises* holding. Without explicit guidance, the SSA, working with a newly narrowed group of qualified coal operators, assigned each *Eastern* [B]eneficiary to the coal operator that had employed that [B]eneficiary for the longest time prior to the effective date of the 1978 [Agreement], but who had also signed a 1974 or later [Agreement]. The question becomes, then, whether the SSA, in its effort to comply with *Eastern Enterprises,* permissibly construed the statute. *See Pittston Co. v. United States,* 368 F.3d 385, 402 (4th Cir.2004) ("Because Congress provided no explicit instructions, the question presented is whether the Commissioner's reassignments under § 9706(a) are 'based on a permissible construction of the statute.' ") (citing [*Chevron USA, Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ] ).

*Sidney Coal Co., Inc. v. SSA,* 427 F.3d 336, 346 (6th Cir.2005) (internal parallel citations omitted).

The court agrees with the reasoning employed by the other federal courts which have addressed this issue and finds that the Commissioner's interpretation of the Coal Act after *Eastern,* as well as her subsequent decision to reassign *Eastern* Beneficiaries to plaintiffs, was neither unambiguously forbidden by the statute nor beyond the bounds of the permissible. *See Barnhart v. Walton,* 535 U.S. 212, 218, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). Despite plaintiffs' protestations to the con-

trary, there is a clear difference between beneficiaries who were legitimately assigned to operators that have since gone out of business, and the *Eastern* Beneficiaries, who had never validly been assigned to anyone.

Section 9706 of the Coal Act directs the Commissioner to "assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business" in the order laid out in the section's three-tiered scheme. 26 U.S.C. § 9706(a). The Supreme Court's decision in *Eastern* effectively declared that the constitutionally permissible definition of "signatory operator" was (and, due to retroactivity principles, always had been) "a signatory to a post–1973 coal wage agreement." As a result, plaintiffs were the proper initial designees for certain *Eastern* Beneficiaries under the language of § 9706(a) and the Commissioner was simply following the language of the statute when she made the post-*Eastern* reassignments in question.

### C. *Chevron* Deference

The parties disagree over the level of deference the court should give the Commissioner's decision. Defendants contend that, under *Chevron USA, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which affords administrative agencies a good deal of latitude in interpreting and administering statutes, the Commissioner's decision to reassign *Eastern* Beneficiaries to signatories like plaintiffs is entitled to deference. (D.I. 10 at 16; D.I. 14 at 18) Plaintiffs counter that the Commissioner's decision is not entitled to deference because "Congress did not delegate rulemaking or interpretive authority to the [SSA]," and, "absent such delegation[,] *Chevron* is not controlling." (D.I. 17 at 35,

citing *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) [15])

As the Third Circuit explained in *Robert Wood Johnson University Hospital v. Thompson*, 297 F.3d 273 (3d Cir.2002),

> the *Mead* Court refused to apply *Chevron* deference because it was clear that Congress did not intend to delegate authority to the United States Customs Service to issue rulings with the force of law. [*Mead*, 533 U.S. at 226–27, 121 S.Ct. 2164]. . . . Similarly, in [*Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988),] the Court held that little deference was owed to the Secretary's position as it was unsupported by agency practice. [*Id.*] at 212–13, 109 S.Ct. 468. Unlike *Mead*, in the case before us, there is adequate indication of congressional intent in the statute to demonstrate substantial delegation of authority to the Secretary, including authority to promulgate guidelines for the reclassification process.

*Robert Wood Johnson*, 297 F.3d at 281. Indeed, the Third Circuit found, "[t]he broad deference of *Chevron* is even more appropriate in cases that involve a 'complex and highly technical regulatory program,' such as Medicare, which require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns." *Id.* at 282 (alterations in original) (citations omitted). Ultimately, the Third Circuit held that courts

> must give deference to [a Secretary's] interpretation of a statute that [s]he is charged with administering unless that

interpretation is contrary to the plain language of the statute, *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), or to congressional intent as manifested in the legislative history, *Pauley v. Beth-Energy Mines, Inc.*, 501 U.S. 680, 696–98, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991).

*Robert Wood Johnson*, 297 F.3d at 284 (internal parallel citations omitted).

■ The Commissioner's interpretation of the Coal Act in the wake of *Eastern* went against neither the plain language of, nor the legislative intent behind, the statute. After the Supreme Court declared that Eastern-type operators were ineligible for assignment under the Coal Act, it was proper for the Commissioner to remove those operators from the equation entirely and reassign the *Eastern* Beneficiaries to the first constitutionally permissible operator who qualified under the language of § 9706(a) (*i.e.*, plaintiffs and their ilk). Plaintiffs' contention that there may only be one possible designee under the statute and, if such designee is constitutionally impermissible (and the assignment, therefore, was void *ab initio*), that the statute forbids those beneficiaries to be assigned to anyone else, is illogical.

Plaintiffs' proposed interpretation of the Coal Act would frustrate the legislative purpose behind the statute, as expressed by Congress, which passed the Coal Act because it found that "in order to secure the stability of interstate commerce, it is necessary to . . . identify persons most responsible for plan liabilities in order to

**15.** "[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Mead*, 533 U.S. at 226–27, 121 S.Ct. 2164.

stabilize plan funding and allow for the provision of health care benefits to such retirees." Coal Industry Retiree Health Benefit Act of 1992, Pub.L. No. 102–486, tit. XIX, subtit. C, § 19142(a)(2), 106 Stat. 3036, 3037 (1992) (prior to 1994 amendment[16]). Congress also identified the policy concerns which had spurred the Coal Act's creation:

(1) to remedy problems with the provision and funding of health care benefits with respect to the beneficiaries of multiemployer benefit plans that provide health care benefits to retirees in the coal industry;

(2) to allow for sufficient operating assets for such plans; and

(3) to provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits to the beneficiaries of such plans.

*Id.* § 19142(b).

Shifting every single *Eastern* Beneficiary into the unassigned pool would undoubtedly tax the resources available from the Combined Fund, which is underwritten first by funds collected under the Surface Mining Control and Reclamation Act, then from all signatory operators. The goal of the Coal Act was to create a "privately financed self-sufficient program" with "sufficient operating assets." These goals would best be served by reassigning *Eastern* Beneficiaries to the first constitutionally permissible operators who qualify under the language of the statute (operators which did, after all, employ those beneficiaries at one time), rather than significantly depleting the resources available for funding the benefits of retirees whose companies have since gone out of business. To do otherwise would place an unneces-

sary (and unfair) burden on operators who never employed the *Eastern* Beneficiaries and who have their own retirees to worry about. With this in mind, the court finds that the Commissioner's actions were a reasonable construction of the Coal Act's assignment hierarchy and should therefore be accorded deference under the standard set forth in *Chevron.*

**D. The Administrative Procedure Act**

Plaintiffs allege that the Commissioner's decision violated §§ 702 and 706 of the APA, which allow for judicial review of administrative agency actions. *See* 5 U.S.C. §§ 702, 706. Under the APA, a court reviewing the final decision of an administrative agency (such as that of the Commissioner of the SSA in the case at bar) " 'shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of [the] agency action.' " *U.S. Steel Corp. v. Barnhart,* No. CV–04–HS–0065–S, slip op. (N.D. Ala. June 20, 2006) (quoting 5 U.S.C. § 706). *See also Lindsey Coal Mining Co. v. Chater,* 90 F.3d 688, 691 (3d Cir.1996). "Accordingly, the issue is whether the administrative determination was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Anker Energy Corp. v. Consolidation Coal Co.,* 177 F.3d 161, 169 (3d Cir.1999) (quoting 5 U.S.C. § 706(2)(A)).

■ Because the court finds that the Commissioner's decision was within her authority and entitled to deference, the fact that she followed the statutory hierarchy laid out in § 9706 indicates that her decision was neither arbitrary nor capri-

---

**16.** In 1994, the Coal Act was amended in order to transfer responsibility for its administration from the Secretary of Health and Human Services to the Commissioner of the SSA. Pub.L. No. 103–296, § 108(h)(9)(B), 108 Stat. 1464, 1487–88 (1994).

cious and did not, therefore, violate the APA.

### E. The Parties' Motions

The court has determined that the Commissioner acted within her authority in reassigning some of the *Eastern* Beneficiaries to plaintiffs in 1999. Because plaintiffs cannot "make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), defendant Trustees is entitled to judgment as a matter of law; its motion for summary judgment (D.I.13) is thereby granted. Similarly, because defendant Barnhart has demonstrated that there exists no "set of facts that would entitle [plaintiffs] to relief," *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), her motion to dismiss (D.I.9) is granted. When "view[ing] the underlying facts and all reasonable inferences therefrom in the light most favorable to [defendants]," *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995), plaintiffs are unable to show that they are entitled to judgment as a matter of law, Fed.R.Civ.P. 56(c); consequently, their motion for summary judgment (D.I.15) is denied.

## V. CONCLUSION

For the reasons stated above, defendant Trustees' motion for summary judgment is granted; defendant Barnhart's motion to dismiss is granted; and plaintiffs' motion for summary judgment is denied. An appropriate order shall issue.

### ORDER

At Wilmington this 11th day of January, 2007, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant Jo Anne B. Barnhart's motion to dismiss (D.I.9) is granted.

2. Intervenor defendant Trustees of the United Mine Workers of American Combined Benefit Fund's motion for summary judgment (D.I.13) is granted.

3. Plaintiffs Peabody Coal Company's and Eastern Associated Coal Corporation's motion for summary judgment (D.I.15) is denied.

4. The Clerk of Court is ordered to enter judgment in favor of defendants and against plaintiffs.